USX CORPORATION and Besssemer and Lake Erie Railroad Company, Plaintiffs,

v.

ADRIATIC INSURANCE COMPANY, et al., Defendants,

v.

Icarom, Formerly known as Insurance Corporation of Ireland, Additional Defendant.

No. Civ.A. 95–866.

United States District Court, W.D. Pennsylvania.

March 22, 2000.

598

J. Michael Jarboe, David A. Lynch, USX Corporation, Law Department, Pittsburgh, PA, James J. Restivo, Jr., Lawrence E. Flatley, Debra H. Dermody, George L. Stewart, II, Reed Smith Shaw & McClay, Pittsburgh, PA, for plaintiffs.

Bernard D. Marcus, Robert L. Allman, II, Scott D. Livingston, Marcus & Shapira LLP, Pittsburgh, PA, David B. Fawcett, Richard S. Dorfzaun, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, Liaison Defense Council.

## OPINION

DIAMOND, District Judge.

Plaintiffs commenced this action seeking indemnification under approximately 278 umbrella and excess policies of insurance for financial losses in excess of $593,118,-296.92, which plaintiffs incurred as a result of the settlement/satisfaction of nine civil suit judgements entered against Bessemer

& Lake Erie Railroad Company ("B & LE") based upon its participation in a twenty-year conspiracy to violate federal and state antitrust laws. A case management order was entered on January 14, 1997, which divided this action into four phases, the first of which was designated "discovery and dispositive motions." Case Management Order of January 14, 1997 at I(D)(1) (Document No. 100). The parties have completed all discovery pertaining to plaintiffs' claims that coverage is afforded under the policies and defendants' bases for denying those claims. Presently before the court are cross-motions for summary judgment. For the reasons set forth below, defendants' motion will be granted and plaintiffs' will be denied.

### Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial,*" or the factual record will be taken as presented by the moving party and judgment will be

entered as a matter of law. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed.R.Civ.P. 56(a), (e)) (emphasis in *Matsushita* ). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." *Harter v. GAF Corp.,* 967 F.2d 846 (3d Cir.1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382–83 n. 12 (3d Cir.1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Big Apple BMW, Inc. v. BMW of North America,* 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993) (although court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

### General Background

Plaintiffs seek damages for breach of contract from each named defendant under the respective policies, subject to the monetary limits of those policies, together with pre-judgment and post-judgment interest.

The alleged breach is defendants' failure to indemnify plaintiffs for the liability arising from underlying third-party actions. The third-party actions followed the indictment of B & LE for a criminal violation of the Sherman Act and its subsequent conviction of the charged crime.

On October 13, 1981, a federal grand jury indicted B & LE and other railroads for criminal conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. On August 31, 1992, B & LE entered a plea of *nolo contendere* to the offense of conspiracy in restraint of trade as charged in the indictment. B & LE voluntarily entered the plea knowing it constituted a plea of guilt to the charges in the indictment and would result in a judgment of guilt as a matter of law. Transcript of July 26, 1982, Acceptance of *nolo contendere* Pleas in *United States of America v. Bessemer & Lake Erie Railroad, Inc., et al.*, Criminal No. 81–396, United States District Court for the District of Columbia, at pp. 23–28, set forth in Volume I of Appendix to Defendants' Motion for Summary Judgment ("Defendants' Appendix") at pp. 82–87. The entry of the plea admitted every essential element of the offense. *United States v. Bessemer & Lake Erie Railroad Co.*, 717 F.2d 593, 597 (D.C.Cir.1983). It likewise barred any subsequent attack of the indictment on the merits and constituted an admission of the truth of all material factual allegations therein. *Id.* at 597 & 599. The indictment charged a multi-faceted conspiracy to eliminate potential competition in the transportation of iron ore which was mined in Minnesota, Wisconsin and Canada, shipped across the Great Lakes and transported by the railroads from docks on the southern shore of Lake Erie to inland steel mills in Western Pennsylvania, West Virginia, Ohio and Kentucky. *Id.* at 594–95.

Between 1982 and 1984, five steel companies, three dock companies and five trucking companies filed civil actions against ten railroads involved in the conspiracy, including B & LE, in federal district courts in Pennsylvania, Ohio, New York and the District of Columbia.[1] On April 17, 1984, the Judicial Panel on Multi-District Litigation consolidated the ten actions for pretrial proceedings at "MDL No. 587" (captioned *In Re Lower Lake Erie Iron Ore Antitrust Litigation*), and assigned the proceeding to the Honorable John P. Fullam of the United States District Court for the Eastern District of Pennsylvania. In May of 1989, Judge Fullam ordered the consolidated cases be tried as a consolidated action. The trial was bifurcated. The liability phase was tried between May 9 and June 18, 1989, and the jury returned verdicts against B & LE in nine of the actions.[2] The damage phase was tried between June 26 and July 28, 1989, to a separate jury, and it awarded substantial damages in eight of the actions. Judgments were entered on June 17, 1989, totaling $4,457,652,953.00, exclusive of interest, costs and attorneys' fees.[3] On Feb-

---

1. The steel companies were Republic Steel Corporation, Jones & Laughlin Steel, Inc. (which included Youngstown Sheet & Tube Company), National Steel Corporation, Wheeling–Pittsburgh Steel Corporation and Sharon Steel Corporation. The dock companies were Erie–Western Pennsylvania Port Authority, Codan Corporation, Toledo World Terminal, Inc. and David W. Reaney and Reaney Dock Company. The trucking companies were Wills Trucking, Inc., Tauro Bros. Trucking Company, C.D. Ambrosia Trucking Company, Dart Trucking Company and R. Weise Trucking. The nine other defendant railroads were the Chesapeake & Ohio Railway Company, the Baltimore & Ohio Railroad Company, CSX Corporation, the Pittsburgh & Lake Erie

Railroad Company, Consolidated Rail Corporation, Norfolk & Western Railway Company, Norfolk Southern Corporation, Penn Central Transportation Company, and the Penn Central Corporation.

2. All other defendants settled prior to or during trial.

3. The judgments reflected the trebling of damages under the federal antitrust laws and the doubling of damages under the Ohio Valenteen Act, as adjusted by set-offs equivalent to the aggregate amount of each MDL 587 plaintiff's settlements with the other MDL 587 defendants.

ruary 27, 1991, Judge Fullam entered an opinion and order denying all post-trial motions except for one aspect of B & LE's motion which challenged an item of damage claimed by one steel company. Final judgments were otherwise entered in accordance with the damage jury's verdicts. *See In re Lower Lake Erie Iron Ore Antitrust Litigation,* 759 F.Supp. 219 (E.D.Pa. 1991). Appeals and cross-appeals were taken. On May 27, 1993, the United States Court of Appeals for the Third Circuit substantially affirmed the district court. *See In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144 (3d Cir.1993). B & LE's petition for rehearing and suggestion for rehearing *en banc* were denied on July 26, 1993. *Id.* at 1185. The Supreme Court denied B & LE's petition for writ of certiorari on January 24, 1994, and plaintiffs thereafter satisfied or settled the MDL 587 judgments.

Plaintiff USX Corporation seeks indemnification under the insurance policies procured pursuant to its catastrophic liability insurance program for seven policy periods between May 12, 1977, and April 1, 1983.[4] The May 12, 1977, through June 1, 1978, program included 5 layers of insurance providing $130 million of coverage in excess of a $50 million self-insured retention. The June 1, 1978, through June 1, 1979, program included six layers providing $150 million of coverage in excess of a $50 million self-insured retention. The June 1, 1979, through December 1, 1979, program included four layers providing $150 million of coverage in excess of a $50 million self-insured retention. The December 1, 1979, through December 1, 1980, program included six layers providing $275 million of coverage in excess of a $25 million self-insured retention. The December 1, 1980, through December 1, 1981, program included seven layers providing $275 million of coverage in excess of a $25 million self-insured retention. The December 1, 1981, through April 1, 1982, program included seven layers providing $325 million of cov-

erage in excess of a $25 million self-insured retention. The April 1, 1982, through April 1, 1983, program included six layers providing $325 million of coverage in excess of a $25 million self-insured retention. *See* Joint Statement of Uncontested Facts (Document No. 427) ("Joint Statement") at ¶ 20–26. Collectively, defendants are domestic and international insurers (or their predecessors, successors-in-interest or assumptive re-insureds, as appropriate) who issued or subscribed to the policies comprising the seven-year program.

USX employed a commercial insurance brokerage service as its agent to procure the insurance in its catastrophic liability program. Employees of the insurance brokerage service worked closely with employees of USX's risk management department to accommodate USX's insurance needs. The policy providing for the initial layer of coverage during the first year was obtained in the London insurance market. USX provided significant amounts of underwriting data to certain underwriters in that market. Shortly after obtaining the first year of coverage, USX's insurance broker prepared a memorandum reviewing the liability insurance policy form. USX thereafter continued to obtain a substantial portion of its catastrophic liability program insurance in the London market.

In each of the seven periods, USX's insurance coverage begins with a first-layer policy that contains the terms of and conditions for coverage. Each layer above the first layer consists of policies which follow the form of the first-layer policy, subject to any special terms or conditions of the individual policy. The first-layer policies generally are designated as "umbrella" policies and are, in all material respects, based upon a standard insurance form known as "the 1971 London umbrella wording." This form was modeled after the 1966 standard form commonly used in the North American market. With the exception of some of the policies compris-

---

4. B & LE is a named insured in USX's policies.

ing the 1982–1983 policy period, the first-layer policies were issued by London Market Insurers, which are certain underwriters at Lloyds' London and certain other companies participating in the London insurance market ("the London Defendants").

In procuring the policies, USX sought to and did obtain the broadest casualty coverage available. The underlying self-insured retentions signified that the insurance was to provide coverage for catastrophic liability. The insurance policies include or incorporate by reference the following "Insuring Agreement:"

COVERAGE—

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of liability:—

(a) imposed upon the Assured by law, or (b) assumed under contract or agreement . . . ,

for damages on account of:—

(i) Personal Injuries

(ii) Property Damage

(iii) Advertising Liability,

caused by or arising out of each occurrence happening anywhere in the world.

Joint Statement at ¶ 27.

The key terms of the Insuring Agreement are as follows. The term "Occurrence"

shall mean an accident, or a happening, or an event, or a continuous or repeated exposure to conditions, which unexpectedly and unintentionally results in a personal injury, property damage or advertising liability during the policy period.

Joint Statement ¶ 28. The term "Personal Injuries"

means bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation; also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities.

Joint Statement at ¶ 29. The term "Property Damage"

shall mean loss of or direct damage to or destruction of tangible property (other than owned by the Named Assured).

Joint Statement at ¶ 30. The term "Advertising Liability" shall mean:—

1) Libel, slander or defamation;

2) Any infringement of copyright or of title or of slogan;

3) Piracy or unfair competition or idea misappropriation under an implied contract;

4) Any invasion of right of privacy;

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Named Assured's advertising activities.

Joint Statement at ¶ 31. The term "Damages"

includes damages for death and for care and loss of service resulting from personal injury and damages for loss of use of property resulting from property damage.

Joint Statement at ¶ 32.

Plaintiffs' complaint avers and their pending motion for partial summary judgment seeks to establish that the outcome of B & LE's underlying conspiratorial conduct constituted an occurrence under Pennsylvania law and the resulting liability reflects a covered form of damage/injury under each key term in the Insuring Agreement. Plaintiffs generally contend, *inter alia,* that the MDL 587 losses constitute (1) a form of economic discrimination within the scope of "discrimination" as used in the term "personal injuries" because the conspirators refused to establish lower rates for less expensive and time-consuming service; (2) a form of "unfair

competition" which was committed in and arose out of B & LE's "advertising activities" because the railroads' tariffs were used as a means of implementing the conspiratorial agreement; and (3) a form of "loss of use" of tangible property because the MDL 587 plaintiffs were deprived of the ability to use equipment and assets which would have been used to compete with the railroads. Plaintiffs further contend that proper notice was given or that the lack of notice did not cause prejudice to the defendants.[5] Plaintiffs further argue that the MDL 587 plaintiffs sustained a form of covered damage/injury during each policy period due to the non-linear, progressive nature of their injuries. Based on these general premises, plaintiffs argue that each defendant is obligated to indemnify USX for the losses arising from the MDL 587 judgments.

Defendants generally·contend that B & LE was not held liable for causing any injury/damage covered by the policies and plaintiffs' attempts to recharacterize the actual liability determined by the MDL 587 juries is contrary to the undisputed facts and governing law.[6] Beyond plaintiffs' asserted failure to fit the underlying loss within the basic requirements of coverage, defendants contend that the antitrust liability, which was imposed for restraint of trade and attempted monopolization, epitomizes the essence of an intended and expected harm and a non-fortuitous loss, and any such loss is expressly precluded under the definition of an occurrence and is uninsurable as a matter of Pennsylvania public policy. Similarly, defendants assert that torturing the terms of the policies to permit recovery here would relieve plaintiffs of the financial consequences of B & LE's illegal conduct and allow a monopolist to retain the benefits derived from participating in an antitrust conspiracy, a proposition which would offend both state and federal public policy. Finally, defendants argue that because plaintiffs failed to give notice of the MDL 587 litigation until after the Third Circuit affirmed the judgments against B & LE, defendants suffered prejudice as a matter of law, thereby precluding coverage on this independent ground as well.

*Overview of the MDL 587 Litigation*[7]

The ten antitrust suits comprising the MDL 587 litigation each charged the rail-

---

5. The policies provide:
NOTICE OF OCCURRENCE—
Whenever the Assured, in the person of the Chairman of the Insurance Committee of United States Steel, has information from which the Assured may reasonably conclude that an occurrence covered hereunder, involves injuries or damages which, in event that the Assured should be held liable, is likely to involve this policy, notice shall be sent as stated in Item 4 of the Declarations as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
Joint Statement at ¶ 33. Relatedly, the policies provide:
ASSISTANCE AND CO–OPERATION—
The Underwriters shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured, but Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers or both in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves, or appears reasonably likely to involve Underwriters, in which event the Assured and Underwriters shall co-operate in all things in the defense of such claim, suit or proceeding.
Joint Statement at ¶ 34.

6. All parties agree that Pennsylvania insurance law applies.

7. The following summary is taken from Judge Fullam's opinion reported at *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 759 F.Supp. 219 (E.D.Pa.1991) and the Third Circuit's opinion at *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3d Cir. 1993) (Mansmann, J.). Because "[t]he same conspiratorial conduct described in the criminal indictment [was] the subject of [the] civil antitrust suit," *id.* at 1162 n. 7, a background summary similar to the summaries in these reported opinions is contained in *United States v. Bessemer & Lake Erie R., Co.*, 717 F.2d 593 (D.C.Cir.1983).

roads with entering into a conspiracy, formed in the mid–1950's, to restrain trade in and monopolize dock handling, storage and transportation costs of shipping iron ore inland from the shore of lower Lake Erie. The conspiratorial agreement was a response of the railroads to a technological innovation in transporting ore across the Great Lakes which began to develop prior to 1956.

Most of the ore used in making steel in the multi-state region served by lower Lake Erie originated in mines in Michigan, Minnesota and Eastern Canada. The ore was shipped across the Great Lakes and unloaded at docks in Pennsylvania and Ohio. For years the prevailing method of transportation involved the shipment of bulk quantities of the ore, which was in an unprocessed, mud-like form. Large transportation vessels known as "bulkers" transported virtually all the ore across the Great Lakes. The bulkers were unloaded by heavy cranes commonly known as "huletts." A hulett unloaded the ore from the hold of a bulker using a clamshell-like claw that dipped into the hold, scooped up a load of the mud-like substance and moved it to the dock where it was loaded directly onto railroad cars or stockpiled at onshore storage areas. The docks used in this process were owned by the railroads and equipped with huletts.

The rates for the various services at all of the railroad docks were identical and established pursuant to Interstate Commerce Commission ("ICC") approved tariffs which specifically were exempt from antitrust scrutiny under § 5(a) of the Interstate Commerce Act ("ICA"), as amended by the Reed–Bullwinkle Act of 1948, 49 U.S.C. § 10701(a) (1949). Pursuant to that amendment, the ICC approved an agreement of the Eastern Railroads which established the Rate Bureau (the Coal, Coke and Iron Ore Committee). B &LE was a member of the Rate Bureau. All railroad action taken pursuant to that agreement was given § 5(a) immunity and conclusively presumed to represent reasonable rates and charges. *Id.* at 223–24. Private (*i.e.*, non-railroad) docks at the lower Lake Erie ports were not equipped with huletts and were unable to compete for ore traffic, which in turn gave the railroads a lawful monopoly over the unloading and land transportation of ore.

In the early 1950s a new technology developed which enabled ore producers to process the ore into high-grade marble-sized pellets. The formation of ore into pellets permitted shipment of the ore in self-unloading vessels. These vessels were able to unload their cargo with an internally mounted conveyor belt. Following the enlargement of a particular lock on the Great Lakes, self-unloaders were able to carry substantially larger loads of ore than bulkers, were able to unload in less time and with a smaller crew and did not require any special equipment. The use of self-unloaders created the potential for non-railroad docks to compete as unloading sites and these docks potentially were able to store and ship ore at lower costs than railroad docks because the land-based unloading equipment and large work crews were not needed. Thus, self-unloaders and non-railroad docks could be used to compete directly with the railroads and this development also made possible the use of trucks as an alternative means of transporting the ore inland.

For years the railroads had controlled access to the unloading docks and provided inland rail transportation of the ore. The self-unloader/non-railroad dock system threatened to compromise the railroads' monopoly over inland transportation. The ability to use private docks created the option of hauling the ore by rail or truck to the inland steel companies, and this competition had the potential to produce significant saving to the steel companies. The MDL 587 plaintiffs' central contention was that the railroads, perceiving the significant threat from the self-unloaders/non-

railroad docks/trucking system, entered into an agreement designed to thwart the progress of the self-unloader technology in order to maintain their dominance in the market and protect their substantial investments in lake shore property and conventional unloading equipment.

As early as 1956 high-ranking railroad officials convened and forged a planned course of action designed to circumvent the development of self-unloaders. The implementation of this agreement was accomplished by three separate means. Railroad officials orally agreed that leases of railroad docks or facilities were to be examined and modified to frustrate the efforts of non-railroad docks to handle ore from self-unloaders. The railroads thus either refused to sell or lease any property that could be used to establish a private dock or began to sell or lease property with express restrictions against such use. The railroads further agreed to keep dock-handling and shipment rates for self-unloaders artificially high at railroad-owned docks and refused to recognize a discount rate for ore transported on self-unloaders, despite the reduced costs in providing such services. Finally, the railroads agreed among themselves to refuse to publish different (competitively priced) commodity line haul rates for hauling ore from private docks.

The railroads converted their agreement into action to effectuate the goal of market preclusion. They used coercion to enforce adherence to the facets of the agreement and succeeded in restricting the lease and sale of railroad-owned dock property and boycotting non-railroad docks. These activities diminished the economic incentives to use self-unloaders and by impeding the development of a private dock system, the railroads succeeded in precluding direct competition from the trucking industry.

The MDL 587 plaintiffs sued under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), Section 4 of the Clayton Act (15 U.S.C. § 15) and the Ohio Valentine Act, Ohio Rev'd Code §§ 1331.01–

1331.99. In addition to other forms of injury, the steel company plaintiffs sought damages for lost savings which would have been realized had the railroads' anti-competitive behavior not retarded the development and implementation of the self-unloader technology. The steel companies identified five compensable forms of injury: (1) savings from lower dock handling rates from private commercial docks, (2) savings from railroad docks that would have been realized from the competition of private docks, (3) lower trucking rates for actual shipment, (4) savings from market-sensitive commodity line haul rates, and (5) inherent savings from the option to choose the most efficient and economical combination of transportation alternatives. The dock companies sought to recover the profits they would have realized had they been able to establish themselves in the market. The trucking companies likewise sought similar damages on the theory that had they not been precluded from entering the market, they would have established themselves and realized significant profits.

B & LE sought to preclude or limit the recovery of damages based upon (1) its (and the other railroads') entitlement to immunity under the ICA and the doctrine in *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and (2) the antitrust standing principles established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Keogh*, the Supreme Court held that private litigants cannot recover damages under the antitrust laws where the damages are based upon rates and charges approved by the ICC. Having established such rates and charges in accordance with the ICA, such rates presumptively are legal and a private litigant is precluded from attempting to prove that hypothetical lower rates would have been charged in the absence of asserted antitrust conduct and the acceptance of the established rates by the ICC. Through the Reed–Bullwinkle Act of 1948, Congress extended the railroads' immunity

to engaging in collective rate-setting activity. Thereafter, any railroad action undertaken pursuant to the rate bureau established by the authorized agreement of Eastern Railroads was immune from antitrust scrutiny.[8] The MDL 587 juries were instructed fully on all immunity issues. The liability jury determined that B & LE had violated the antitrust laws through forms of conduct which were not immune.[9] The damages jury calculated its awards based upon the railroads' non-immune conduct.[10] The Third Circuit ultimately concluded "that the district court correctly characterized B & LE's anti-competitive activity as market preclusion, and *Keogh*'s protective rule [could not be applied] to forbid recovery for the resulting economic detriment." 998 F.2d at 1159.

The MDL 587 plaintiffs successfully demonstrated that the railroads conspired to protect their control over the ore transportation market and effectively retarded the entry of lower-cost competitors into that market. It was the railroads' collective hindering of the development of the lower-cost market which defined the MDL 587 litigation. The railroads' concerted action was found to have thwarted competition by precluding the steel companies from utilizing alternative, lower-cost private docks, which in turn diminished the steel companies' economic incentives to develop self-loaders.[11] The natural consequences of these activities compelled the steel companies to continue to pay the rates lawfully established by the railroads. And, while the measure of damages began with the ICC-approved tariffs, the non-immune anti-competitive market preclusion orchestrated by the railroads distinguished the steel companies' damage awards from those based on concerted

---

8. Although the participating railroads were permitted to establish rates, charges, divisions and proposed tariffs to be filed with the ICC under the rate-bureau mechanism, in order to maintain ICA immunity each railroad had to remain free to propose its own tariffs and any agreement which attempted to curtail the freedom of independent action transcended the immunity and could give rise to antitrust liability. Similarly, combinations and agreements on matters other than tariff proposals which were established outside the rate-bureau mechanism likewise could be found to violate the antitrust laws.

9. The MDL 587 plaintiffs presented to the liability jury evidence of the railroads' (1) agreement to restrict the sale and lease of lake shore property which could be used for private docks, (2) refusal to handle self-unloaders in a way that would make economic sense for the steel companies to utilize them and (3) collective coercive action aimed at preventing independent action by each carrier.

10. Throughout the litigation B & LE contended that the damages sought (and ultimately recovered) were based upon price-fixing that had been approved by the ICC. The district court relied on *Keogh* to dismiss all claims for damages based upon the actual rates charged by the railroads. This left for consideration the steel companies' claims that had the railroads not retarded the development of the self-unloader industry they would have paid

(1) lower dock-handling rates to the private docks (as compared to the rates they actually paid to the railroad docks), (2) lower lake transportation costs and (3) lower land transportation costs by utilizing the trucking industry (had the railroads not restrained competition and monopolized line hauling from railroad-owned docks). The steel companies were awarded damages in one or more of the following categories: inflated dock-handling charges; damages flowing from inflated lake transportation costs; additional "demurrage" costs (the amount assessed while equipment stands idle); and increased investment costs in the subsequent development and acquisition of self-unloading vessels. Judge Fullam reasoned that these damages directly resulted from the elimination of competition and were independent of the rates approved by the ICC.

11. The steel companies claimed that they would have purchased or leased their own self-loader vessels. In addition, National Steel owned and operated its own fleet of transportation vessels, one of which was the *Stinson*. National Steel claimed it would have built the *Stinson* earlier and at a lower cost. Damages ultimately were awarded to National Steel for this claim and although Judge Fullam set these damages aside on the theory that the impact of inflation was offset by the time-value of money, the Third Circuit reversed that ruling and reinstated the damages due to B & LE's failure to challenge that award in its motion for directed verdict.

rate-making activities protected by *Keogh.* Because the juries were instructed fully on the scope of the *Keogh* doctrine and found both the offensive conduct and the resulting damages to be beyond its scope, the steel companies' damages were not based on activities undertaken to establish tariff rates approved by the ICC.[12]

B & LE also argued that the MDL 587 damage claims were precluded by the indirect purchaser doctrine established in *Illinois Brick,* as interpreted in *Mid–West Paper Products Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir.1979). *Illinois Brick* was a price-fixing case where the Supreme Court held that only the original purchaser who initially paid the inflated price could maintain an antitrust action. In *Mid–West Paper,* the Third Circuit applied the doctrine and held that only purchasers from a price-fixing conspirator sustained an antitrust injury and purchasers from non-conspiring competitors of the conspirators could not recover, even though the conspiracy may have enabled the independent competitor to charge higher prices due to an inflated market. Judge Fullam reasoned that the indirect purchaser doctrine did not bar recovery of the steel companies' material-handling awards or the dock and trucking companies' recoveries. He similarly reasoned that the inflated dock-handling charges were incurred by the steel companies as customers of the railroads and thus as direct purchasers. The inflated lake transportation charges, although less clear, also survived an *Illinois Brick* challenge because of the steel companies' history of direct involvement in the ownership and control of ore transportation vessels.[13]

The Third Circuit upheld the steel companies' damage awards against B & LE's *Illinois Brick* challenge under a more complex and differently focused inquiry. It considered each component of the recovered damages to determine whether the injury had a causal relation to the antitrust violation, focusing on and balancing the consideration of (1) the causal connection between the violation and the harm and the intent of B & LE to cause that harm, (2) whether the injury was intended to be redressed by the antitrust laws, (3) the directness of the injury, (4) the existence of other direct victims and (5) the potential for duplicative recoveries or the recovery of damages which would require a complex apportionment analysis. The court reasoned that the steel companies' lake transport savings awards were recoverable because the conspiracy took the form of and sought to effectuate a market exclusion, the transportation industry existed exclusively for the steel companies, the direct nature of the injury established a sufficient causal connection to the conspiracy, the injury was a type intended to be redressed by the antitrust laws and, while there were other direct victims and the potential for duplicative recoveries and complex apportionment problems, this component of the steel companies' damages was measured by the difference between the amounts they actually paid to transport the ore and the lower prices they would have paid had the conspiracy not blocked implementation of the lower-cost system. Ascertaining this difference did not require undue speculation. It likewise upheld the steel companies' recoveries for inflated dock handling charges against B & LE's challenge of indirect

---

**12.** The *Keogh* doctrine was not applicable to the dock and trucking companies' claims because the doctrine is limited to claims of consumers. The dock and trucking companies sought to be direct competitors with the railroads and did not advance claims as consumers of their services.

**13.** Through long-term leases and other contractual arrangements, the steel companies had assumed responsibility for financing and operating ore-carrying vessels. It thus was reasonable for the juries to conclude that absent the conspiracy, the steel companies would have become similarly involved with self-unloaders and would have achieved direct cost reductions. On this basis Judge Fullam upheld the lake transportation savings awards to the steel companies.

injury, reasoning that although the dock companies were another direct victim of the conspiracy, the steel companies were awarded damages for the inability to utilize private docks and thus the damages arose from the conspiracy's elimination of competition from those docks, not from the charges which might have been paid to the private docks. It similarly upheld the awards to the trucking companies, reasoning that the conspiratorial actions clearly were intended to inhibit competition by the trucking companies, a restraint against market entry precisely was the type of injury the antitrust laws were designed to prevent, and any difficulty in measuring damages was brought about by the railroads' conduct.

### Overview of the Applicable Law

At the core of the parties' dispute are disagreements concerning the meaning and scope of the key terms in the Insuring Agreement. The interpretation of an insurance policy is a question of law for the court. *Reliance Insurance Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir.1997); *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983). Construing an insurance policy requires the court to ascertain the intent of the parties as manifest by the language used in the written agreement. *Riccio v. American Republic Ins. Co.*, 550 Pa. 254, 705 A.2d 422, 426 (1997). The policy is to be read as a whole and the intent of the parties is to be ascertained from the entire instrument. *Riccio*, 705 A.2d at 426 (*citing Smith v. Cassida*, 403 Pa. 404, 169 A.2d 539, 541 (1961)). "When the policy language is clear and unambiguous, the court must give effect to the language in the contract." *Id.; The Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999) (*citing Standard Venetian Blind Co.*, 469 A.2d at 566). Where, however, the policy is ambiguous, the clause giving rise to the ambiguity must be construed in favor of the insured. *The Medical Protective Co.*, 198 F.3d at 103; *Reliance Ins. Co.*, 121 F.3d at 900–01;

*Riccio*, 705 A.2d at 426; *Standard Venetian Blind*, 469 A.2d at 566. In ascertaining the intent of the parties the court is to interpret the policy with an eye toward avoiding ambiguities and giving effect to all of the provisions in the policy. *The Medical Protective Co.*, 198 F.3d at 103 (*citing Little v. MGIC Indemnity Corp.*, 836 F.2d 789, 793 (3d Cir.1987)); *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir.1987) (a policy is to be interpreted in a manner which gives meaning to all of its terms when read as an entirety and phrases are not to be considered in isolation but by a reading in harmony with the rest of the contract).

Ambiguities generally take two forms: patent and latent. *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 740 A.2d 1179, 1185 (Pa.Super.1999). Patent ambiguities appear on the face of the contract from the use of defective, obscure or insensible language. *Id.* (*citing Z & L Lumber Co. v. Nordquist*, 348 Pa.Super. 580, 502 A.2d 697, 700 (1985)). A latent ambiguity arises from extraneous or collateral facts that render the meaning of contract language uncertain even though in a general sense the language appears clear and unambiguous as written. *Id.*

In ascertaining whether a term of the policy is ambiguous, the issue is whether the questioned term or phrase as examined in the context of the entire policy is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *The Medical Protective Co.*, 198 F.3d at 103 (*quoting Reliance Ins. Co.*, 121 F.3d at 900). A term or phrase is ambiguous if "reasonably intelligent" people "on considering it in the context of the entire policy would honestly differ as to its meaning." *Northbrook Ins. Co. v. Kuljian Corp.*, 690 F.2d 368, 372 (3d Cir.1982).

Determining whether specific policy language is susceptible of different reasonable constructions is not to be done in a vacuum. *Madison Construction Co.*

*v. Harleysville Mutual Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999). Instead, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." In performing the inquiry the court is not permitted to distort the meaning of the language or employ a strained contrivance in order to create an ambiguity. *Id.* (*citing Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 663 (1982)); *Northbrook Ins. Co.,* 690 F.2d at 372 (a court may not twist the language or rewrite the policy to create doubts where none exist); *McNally v. Republic Ins. Co.,* 718 A.2d 301, 303 (Pa.Super.1998) ("we will not torture the clear and unambiguous language of [a] policy so as to create [an obligation] that does not otherwise exist"). Words of common usage in an insurance policy are to be given their natural, plain and ordinary meaning. *Riccio,* 705 A.2d at 425 (*citing Easton v. Washington County Ins. Co.,* 391 Pa. 28, 137 A.2d 332, 335 (1957)); *Madison Construction Co.,* 735 A.2d at 108. These principles preclude a finding of ambiguity based on the contention that a particular term is so broad that it virtually has no limit in its application. *Madison Construction Co.,* 735 A.2d at 107. Instead, the inquiry must be "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts" and thus the court is to focus only on the factual scenario at hand. *Id.* Throughout the undertaking the language employed by the parties is the "polestar" of the inquiry. *Id.* at 106; *see also Selko v. Home Ins. Co.,* 139 F.3d 146, 151 (3d Cir.1998) (language of policy remains primary consideration and it is to be construed according to its plain and ordinary meaning) (citations omitted).

 "[T]he parties' reasonable expectations are to be the touchstone of any inquiry into the meaning of an insurance policy." *Bensalem Township v. International Surplus Lines, Ins. Co.,* 38 F.3d 1303, 1309 (3d Cir.1994). Although the language of the policy normally provides the best indication of the parties' reasonable expectations in forming the contract, the totality of the insurance transaction must be examined to ascertain the reasonable expectations of the insured. *Reliance Ins. Co.,* 121 F.3d at 903. In ascertaining the intent of the parties, consideration must be given to any reasonable expectation the insurer created in the insured during the negotiation process. *The Medical Protective Co.,* 198 F.3d at 106. As a result even the most clear and unambiguous provisions of a policy will not bind an insured where an insurer improperly has created a reasonable expectation in the insured that coverage will exist for a particular type of loss. *The Medical Protective Co.,* 198 F.3d at 106–07.[14] Absent sufficient justification, however, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous." *Frain v. Keystone Ins. Co.,* 433 Pa.Super. 462, 640 A.2d 1352, 1354 (1994).

A substantial aspect of the parties' dispute also concerns the appropriate scope of review in evaluating the liability arising from the MDL 587 litigation. Plaintiffs contend that the entire underlying course of conduct for which coverage is sought must be examined to determine whether any facts therein create a scenario which would trigger the defendants' contractual obligations. Plaintiffs specifically argue that it is the facts alleged in the underlying complaint which establish whether a policy's coverage is triggered and it is the construction of those facts which controls rather than the formal theory of liability or label placed on the advanced cause of action. At various times plaintiffs argue that this court's review includes an assessment

---

**14.** The Supreme Court of Pennsylvania has only applied this aspect of the doctrine "in very limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and insurer deception. *Madison Construction Co.,* 735 A.2d at 109 n. 8.

of the testimony and evidence submitted by B & LE in the MDL 587 litigation and whether any aspect of the entire course of conduct conceivably could fall within the scope of the Insuring Agreement. Defendants contend that the duty to indemnify necessarily is measured by the material facts actually established in the MDL 587 trial and this court need look no further than the jury instructions given and special interrogatories rendered therein to determine unequivocally that the losses are not covered.

The insuring agreement creates a contract of indemnification. Plaintiffs' proposed scope of review confuses the standards used to determine whether a contingent duty to indemnify is created by an underlying complaint (thus triggering the duty to defend in a standard liability policy containing such a duty) and those employed to determine whether there is an actual duty to indemnify.

 It is a well-accepted principle that an insurer's duty to defend is "conceptually distinct from and legally independent of its duty to indemnify, that is, its obligation to pay a judgment." *Sherman v. Ambassador Ins. Co.*, 670 F.2d 251, 258–59 (D.C.Cir.1981); *C.H. Heist Caribe Corp. v. American Home Assur.*, 640 F.2d 479, 483 (3d Cir.1981) (emphasizing distinction between duties to defend and indemnify and recognizing that duty to defend necessarily is a broader duty). "It follows that there may be a duty to defend without a duty to indemnify." *The Frog, Switch & Manufacturing Co., Inc. v. The Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir.1999).

 The cases are legion which hold that where a liability policy contains an obligation to defend, that obligation is triggered if the underlying complaint avers any facts that potentially could support a recovery under the policy, and once that obligation is triggered, the insurer has a duty to defend until the claim is confined to a recovery that the policy does not

cover. *See, e.g., General Accident Ins. Co. of America v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997); *The Frog, Switch and Manufacturing Co.*, 193 F.3d at 746. The duty to defend thus carries with it a conditional obligation to indemnify in the event the insured is held liable for a covered claim. *Id.* The duty to defend and the contingent duty to indemnify both flow from a determination that the underlying complaint triggers coverage; this determination is not based solely on the particular cause of action pleaded, but "[i]nstead it is necessary to look at the factual allegations contained in the complaint." *Mutual Benefit Ins. Co. v. Haver*, 555 Pa. 534, 725 A.2d 743, 745 (1999); *C.H. Heist Caribe Corp.*, 640 F.2d at 483 (the factual allegations of complaint must be reviewed to determine whether terms of policy potentially apply). The averments of the underlying complaint must be "liberally construed with all doubts as to whether the claims may fall within the policy coverage to be resolved in favor of the insured." *Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co.*, 704 A.2d 665, 669 (Pa.Super.1997) (*citing Cadwallader v. New Amsterdam Cas. Co.*, 396 Pa. 582, 152 A.2d 484 (1959); *The Frog, Switch and Manufacturing Co.*, 193 F.3d at 746).

 In contrast, the actual duty to indemnify stands on separate footing. An insurer is required to indemnify only where the insured is held liable for a claim actually covered by the policy. *Allen*, 692 A.2d at 1095 (*citing Pacific Indemnity Co. v. Linn*, 766 F.2d 754 (3d Cir.1985)); *see also Winner International Corp. v. Continental Casualty Co.*, 889 F.Supp. 809, 816 (W.D.Pa.1994) ("While an insurer must defend its insured if the complaint alleges conduct that potentially falls within the scope of the policy, it must indemnify its insured only if liability is found for conduct that actually falls within the scope of the policy.") (*citing Allstate Ins. Co. v. Brown*, 834 F.Supp. 854, 857 (E.D.Pa.1993) (there is no duty to indemnify "if the conduct for which the insured is found liable does not

come within the scope of the policy")) (*citing Air Products & Chemicals v. Hartford Accident & Indemnity Co.*, 707 F.Supp. 762, 776 (E.D.Pa.1989)). Thus, the duty to indemnify does not arise until the liability imposed against the insured is conclusively established. *C.H. Heist Caribe Corp.*, 640 F.2d at 483; *Enron Oil Trading & Transportation Co. v. Underwriters of Lloyd's of London*, 47 F.Supp.2d 1152, 1161 (D.Mont. 1996) (actual indemnification is dependent upon whether the insured is found liable for a covered claim). Where the underlying action has been resolved by a jury, the insurer's duty to indemnify is determined by the material facts established at trial. *Enron Oil*, 47 F.Supp.2d at 1161 (*citing American Motorists Insurance Co. v. General Host Corp.*, 946 F.2d 1482, 1488 (10th Cir.1991)).

Where an insured seeks indemnification for underlying liability established by a judgment, the precepts of finality and estoppel are brought into play. The doctrine of *res judicata* binds parties and their privies to an action in which a judgment was rendered. *Clinchfield Railroad Co. v. United States Fidelity & Guaranty Co.*, 160 F.Supp. 337, 340 (E.D.Tenn. 1958). Where a party has had a full and fair opportunity to litigate a particular issue, he is not, ordinarily, entitled to relitigate the matter. *Id.* (*citing in support* 50 C.J.S. Judgments § 763 (party judicially is estopped to relitigate issues in suit to which he was a party)). Thus, in actions between indemnitors and indemnitees, the indemnitee is subject to the burdens, as well as the benefits, of the rules of *res judicata* with regard to matters determined in the third-party action and is estopped from showing that the prior judgment was based upon an incorrect finding of fact. *Id.* at 340–41 (*citing, inter alia,* Restatement of Law, Judgments, § 107(h) and *Crawford v. Pope & Talbot, Inc.*, 206 F.2d 784, 795 (3d Cir.1953); *Fidelity & Casualty Co. of New York v. Federal Express*, 136 F.2d 35, 39 (6th Cir.1943)). These well-settled principles extend to specific judicial determinations and conclusions about the legal import of the material facts, even though "the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Department Stores v. Moitie*, 452 U.S. 394, 398–99, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (*citing Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927) (erroneous conclusion reached by appellate court is not subject to collateral attack) and *Reed v. Allen*, 286 U.S. 191, 52 S.Ct. 532, 76 L.Ed. 1054 (1932) (emphasizing "conclusive character of judgments")).

Pennsylvania law recognizes the specific application of the rules pertaining to the finality of judgments in the context of insurance coverage disputes and the Pennsylvania Supreme Court long ago recognized that "a judgment recovered against an insured by an injured party is conclusive on the issues there determined in a subsequent proceeding by the injured party or by the insured against the insurance carrier for indemnity." *Renschler v. Pizano et al. (State Automobile Ins. Ass'n., Intervenor)*, 329 Pa. 249, 198 A. 33, 35 (1938). On this score "there is complete unanimity among the authorities in declaring that the plaintiff, in an action to recover indemnity, is bound by all findings and conclusions without which the judgment could not have been rendered." *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368, 372 (1951). It has been recognized in Pennsylvania for more than 150 years that in such circumstances an insured is not at liberty "to prove that the recovery [against him] was wrong." *Id.* (*quoting Weckerly v. German Lutheran Congregation*, 3 Rawle 172, 180 (Pa.1831) (Justice Kennedy)). The rationale for these principles

is plain enough. In such a case the indemnitee himself relies on the judgment against him in the earlier action as a basis to his right of recovery over, and with the judgment he must take for

better or worse the adjudicated facts on which the judgment rests.

*Id.* at 373.

A recent application of these principles is found in *Unigard Security Insurance Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 962 S.W.2d 735 (1998). There, the insured, Murphy Oil USA, Inc., filed suit against a number of carriers seeking coverage under various comprehensive general liability policies for a judgment awarding compensatory and punitive damages. Murphy Oil leased an island in the Mobil River in Alabama and operated a petroleum-storage facility on the island. During the 24–year lease Murphy Oil's operations resulted in routine spills of petroleum products during cleaning and maintenance of the storage tanks and loading the petroleum into transport vehicles. In addition, three major spills occurred in 1970, 1975 and 1982. *Id.* at 736. These spills were caused by over-estimations of the capacity of the tanks into which the petroleum products were being pumped. *Id.* at 737.

Murphy Oil returned possession of the island to the lessor in 1985 and did not test for possible contamination or engage in any clean-up efforts. Four years later, the lessor learned of the contamination and notified Murphy Oil, which refused to assist in the clean-up. The lessor commenced an action in 1990 seeking compensatory and punitive damages under the theories of negligence, breach of lease and trespass. The negligence claim alleged that Murphy Oil had failed to use reasonable care in preventing the release of the petroleum products and was negligent in its use, operation and/or occupancy of the premises. The breach-of-lease claim alleged that Murphy Oil breached the lease by failing to surrender the premises in the same condition it was in at the commencement of the lease, based on a provision in the lease which required Murphy Oil to "quit and surrender the premises hereby demised in as good state and condition as reasonable usage thereof will permit." *Id.* The trespass claim alleged Murphy Oil had

interfered with the lessor's rights in the property and the trespass had been accomplished by malice, fraud or oppression. The negligence action was dismissed as barred by the statute of limitations and the breach of contract and trespass claims were submitted to a jury.

The jury found Murphy Oil had breached its lease, which in turn caused the contamination of the island, and awarded $3.4 million in compensatory damages. The jury further found that Murphy Oil had committed a trespass and although it did not award compensatory damages for the trespass, it did award $4.6 million in punitive damages upon a finding that the trespass had been accompanied by malice, fraud or oppression.

Murphy Oil sought indemnification under various policies which obligated the insurers "to indemnify the Assured for all sums the Assured shall be obligated to pay by reason of liability imposed upon the Assured by law ... for damages ... on the account of ... property damage...." *Id.* at 739. The Supreme Court of Arkansas refused to construe the breach of contract liability as a legal obligation to pay damages "on the account of" property damage. It explained:

> The coverage question thus turns on the nature or type of liability that Murphy Oil incurred in the underlying Alabama suit. If the underlying liability was for damages imposed "on account of" or "because of" accidentally caused "property damage," then there is potential coverage under the policies. If the underlying liability was for damages imposed for some other reason, then there is no potential coverage.

\* \* \* \* \* \*

It is obvious to us that the Alabama jury, considering the instructions it received from the District Court and its answers to the interrogatories, made the award for compensatory damages "on account of" or "because of" Murphy Oil's breach of its lease, not on account

of any property damage that resulted in Murphy Oil's operations on the island. The basis of Murphy Oil's liability for compensatory damages was simply its failure to honor its covenant to "quit and surrender the premises hereby demised in as good state and condition as reasonable usage thereof will permit." Murphy Oil's liability for compensatory damages, therefore, did not arise from conduct on the part of Murphy Oil that injured or damaged any property. The case would arguably be different, of course, had the jury based its award of compensatory damages on the negligence claim originally brought by the [Lessor]. As mentioned, however, that claim was dismissed under the statute of limitations and never reached the jury.

*Murphy Oil,* 962 S.W.2d at 740. Thus, it is the actual basis for liability in the underlying action which determines whether there is a duty to indemnify, not whether the underlying course of conduct involved historical facts which could be marshaled to support a covered claim.

As explained below, an application of the above principles demonstrates that the MDL 587 loss is not within the scope of the Insuring Agreement.

### Analysis

#### A. Property Damage

Plaintiffs assert the MDL 587 liability constitutes "property damage" because the liability was imposed for loss of use of tangible property, including loss of use of docks, trucks and self-unloading vessels. They similarly assert that the liability was imposed for a diminution of value in such property. Relying on *Sola Basic Indus., Inc. v. U.S. Fidelity & Guaranty Co.,* 90 Wis.2d 641, 280 N.W.2d 211 (1979) and *Lucker Mfg. v. The Home Ins. Co.,* 23 F.3d 808 (3d Cir.1994), plaintiffs advance the following argument. The typical property damage provisions in standard comprehensive general liability ("CGL") policies do not require physical damage to tangible property, but instead provide coverage for damages awarded solely for diminution in the value of tangible property as well as the loss of use of such property. The typical "loss of use" clause in CGL policies was amended in 1973 to reflect coverage for loss of use of tangible property which had not been physically injured or destroyed, and a commentary bulletin accompanying the revision indicated that under the typical 1966 standard policy coverage for such losses always was intended.[15] The MDL 587 claimants were injured by a delay in the utilization of self-unloaders. This resulted in the inability of the trucking and private dock companies to compete in the market, and the inability of the steel companies to use (1) self-unloaders, (2) private docks for unloading, and (3) the combination of private docks and trucks for inland transportation. Plaintiffs accordingly argue that the liability was im-

**15.** Given the nature and magnitude of the dispute, the parties were permitted to engage in liberal discovery prior to a determination that various terms in the policies are or are not ambiguous. Plaintiffs were permitted to explore the drafting history of various provisions, including subsequent revisions or modifications thereof, in order to develop and present fully their position. *See, e.g., RTC v. Urban Redevelopment Auth.,* 536 Pa. 219, 638 A.2d 972, 975 (1994) ("The parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage [in the trade] to explain the meaning of words in a writing is concerned [and] where terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter."). In addition, plaintiffs took the depositions of a number of lead underwriters for certain of the London market defendants. All such evidence has been considered carefully by the court, but is discussed or mentioned only to the extent necessary to explicate and resolve the issues presented. *Compare Sunbeam Corp. v. Liberty Mutual Ins. Co.,* 740 A.2d 1179, 1184–85 (Pa.Super.1999) (although extrinsic evidence may be considered where contract language is ambiguous, to be probative of usage in the trade in demonstrating an ambiguity the evidence must bear on "a generally accepted and applied usage of the phrase by the insurance industry as a whole").

posed for economic losses caused by a loss of use of tangible property and as such it is a form of covered property damage.

Defendants contend that coverage is provided only for loss of use of or diminution in value in property resulting from actual property damage and the liability did not result from an actual injury to any tangible property. Defendants further argue that the damages were awarded solely for lost profits, and such losses cannot be construed as a loss of use of property within any reasonable construction of the language at issue.

■■■ The MDL 587 liability was not imposed "on account of . . . property damage. . . ." The liability reflected awards for lost savings and profits caused by the lack of competition and the inability of the dock and trucking companies to gain a foothold in the market. Plaintiffs' attempt to recharacterize this liability as a form of property damage fails for a number of reasons.

First, the liability was not imposed for damages on account of "the loss of or direct damage to or destruction of tangible property" within the meaning of the Insuring Agreement. When the policies were purchased the established reasonable expectation was that where the insured's conduct did not affect the physical ability to use a third-party's property, there was no property damage to or loss of use of the third-party's property under a policy which requires "injury to or destruction of tangible property." *See McDowell–Wellman Engineering Co. v. Hartford Accident and Indem. Co.*, 711 F.2d 521, 526 (3d Cir.1983) (*citing, inter alia, Yakima Cement Products Co. v. Great American Ins.*

*Co.*, 93 Wash.2d 210, 608 P.2d 254, 258–59 (1980) (same)).[16] It also was the reasonable expectation that under a policy which covers "damages for loss of use of property resulting from property damage," there must be *property damage* before "there is coverage for any loss of use the damage caused." *Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 136 (3d Cir.1988).

In *McDowell–Wellman*, the insured built a ore bridge for a steel company that was used to supply raw materials to two blast furnaces. The bridge subsequently collapsed. The steel company sought damages for the repair and replacement costs and lost profits caused by additional costs in maintaining the blast furnaces while the repairs were being made.[17] The insured sought coverage under the theory that the business interruption loss constituted loss of use or diminution in the value of the blast furnaces. The lost production revenue was held not to constitute either type of loss because there was no injury to or destruction of the third-party's tangible property. Instead, the loss arose from the loss of use of the insured's product, the ore bridge. Because the blast furnaces remained operable and there was no form of damage to tangible property beyond the insured's product, there was no covered form of property damage and *a fortiori* there could be no loss of use or diminution in value therefrom.

Here, there was no loss of, direct damage to, or destruction of, tangible property forming an essential element in or a substantial aspect of the MDL 587 plaintiffs' recoveries. Each MDL 587 plaintiff's

---

**16.** *The subsequent revisions by the industry made clear that the loss of use could be to property that was not "physically injured." The clarifications did not change the basic expectation that the loss of use must be causally related to damage to tangible property. The industry's subsequent expansion of the loss of use coverage did not retroactively change this basic expectation and it is the intent of the parties at the time the contract* was formed that provides the relevant focus in the matter at hand.

**17.** After the ore bridge collapsed the steel company rented front-end loaders and bulldozers to move ore to the blast furnaces, stored additional ore at offsite locations, employed additional train crews and incurred similar disruption expenses. *McDowell–Wellman*, 711 F.2d at 523 n. 4.

tangible property remained operable for all intended physical and natural uses to which the property could be put. The dock companies were at all times able to use their property as commercial docks and the trucking companies were at all times able to use their trucks to provide transportation services. The trucking and dock companies sought lost profits that they would have made had they been able to establish themselves as competitors and reap the benefits of the additional business. The steel companies were at all times able to use their production equipment and merely sought lost savings from the reduced prices which competition would have produced. Thus the losses did not reflect compensation for some direct impact on particular tangible property, but instead were based upon various assumptions about what would have occurred if the market would have developed by natural economic incentives. Under these circumstances the principles of *McDowell–Wellman* demonstrate that the loss was not a covered form of property damage. *See also Lucker Manufacturing v. The Home Ins. Co.*, 818 F.Supp. 821, 827 (E.D.Pa.1993) ("*McDowell–Wellman* plainly illustrates what is meant by 'loss of use,' in a typical CGL policy. Both the district court and the Third Circuit found that there was no 'loss of use' because the blast furnaces were capable of operating and producing steel as intended, despite the collapse of the ore bridge."), *aff'd on other grounds,* 23 F.3d 808 (3d Cir.1994).

Plaintiffs' reliance on *Sola Basic* and *Lucker* is misplaced. Those cases involved situations where property damage to or caused by the insured's product gave rise to a loss of use of a third-party's property. In *Sola Basic*, the failure of the insured's product, a transformer, rendered a third-party's blast furnace completely inoperable. As a result, the third party acquired alternative power and sought to recover the costs thereof from the insured. In determining that there was coverage for the complete interruption of operation, the Supreme Court of Wisconsin surveyed the persuasive authority from various jurisdictions and noted that the court in *Hamilton Die Cast, Inc. v. U.S. Fidelity & Guaranty Co.*, 508 F.2d 417 (7th Cir.1975), held that damages for loss of investment, anticipated profits and good will are not recoverable from the mere inclusion of a defective component part where no physical damage to other property results therefrom. And although the *Sola Basic* court questioned the justification for continuing to require actual physical injury to tangible property in light of subsequent authority from an intermediate Illinois Appellate Court, the court also emphasized that the recovery in *Sola Basic* was for a complete loss of use of the third-party's property and did not represent lost profits, but instead measured the diminution in value of the plant caused by the additional costs incurred while the malfunctioning transformer was being replaced. *Accord Continental Casualty Co. v. Gilbane Building Co.*, 391 Mass. 143, 461 N.E.2d 209, 213 (1984) ("Tangible property *rendered useless* is injured and hence covered, since the definition of damages includes 'loss of use of property resulting from property damage.' ") (emphasis added) (*citing* 3. R. Long, *The Law of Liability Insurance*, App. B, § 6 (1981)).

*Lucker* involved the issue of whether a clause providing for the "loss of use of tangible property that has not been physically injured" covered the costs of correcting a defective component part which had been designed and was to be incorporated into a product which had not yet been manufactured. The court opined that the plain language of the clause covered an interruption of income caused by a wrongful act not accompanied by physical injury and further explained:

> The loss of a non-physical use of a product, such as offering it for sale, should be considered a "loss of use" and ... the decreased value of a product because of loss of customer acceptance of the product is a "loss of use" within the meaning of the standard CGL policy.

*Lucker*, 23 F.3d at 816. Thus the complete loss of a product made for a particular purpose caused by a change in the customer's acceptance of it constituted a loss of use of property that had not been physically injured. The court went on to hold, however, that at the time customer acceptance was lost, the component part still was being designed and thus it was a form of intangible property which had "no intrinsic marketable value of its own," similar to "investments," "good will" or "economic interest" in the form of profits, investment value and productivity. *Id.* at 819 (*citing* various Pennsylvania cases). Because the insured sought coverage for damages from the loss of the design itself, an intangible thing, the loss of use was not covered property damage. *Id.* at 820–21.

Here, none of the MDL 587 plaintiffs recovered for property which had been rendered useless or diminished in value because of the failure of physical property or a product belonging to B & LE. Instead, the liability was imposed for the loss of intangible property, *i.e.*, the ability to compete and generate profits, gain investment values and increase productivity. Such losses consistently have been distinguished from forms of covered property damage. *See, e.g., Lazzara Oil Co. v. Columbia Cas. Co.*, 683 F.Supp. 777, 780 (M.D.Fla.1988), *aff'd*, 868 F.2d 1274 (11th Cir.1989) (lost profits and business good will awarded in antitrust price-fixing scheme were economic losses that did not "constitute damage or injury to tangible property" under CGL policies, nor were they a "loss of use of tangible property ... within the scope of the ... policies"); *L. Ray Packing Co. v. Commercial Union Ins. Co.*, 469 A.2d 832 (Me.1983) (award for inability to compete from antitrust violations constituted loss of profits and thus was outside meaning of "property damage" in CGL policy); *Jefferson–Pilot Fire & Cas. v. Sunbelt Beer Distributors, Inc.*, 839 F.Supp. 376, 379 (D.S.C.1993) (loss of earnings, benefits, earning capacity and reputation are economic losses which do not constitute damage or injury to tangible

property) (*citing in support Giddings v. Industrial Indemnity Co.*, 112 Cal.App.3d 213, 169 Cal.Rptr. 278, 281 (1980); *Gulf Ins. Co. v. L.A. Effects Group, Inc.*, 827 F.2d 574, 577 (9th Cir.1987) ("strictly economic losses like lost profits, loss of good will, loss of anticipated benefit of a bargain and loss of an investment, do not constitute damage or injury to tangible property covered by a [CGL] policy"); *American States Ins. Co. v. Crawley Constr., Inc.*, 779 F.Supp. 137, 138 (N.D.Cal.1991), *aff'd*, 5 F.3d 534, 1993 WL 339834 (9th Cir.1993) (lost profits "simply do not relate to 'property damage' defined as 'physical injury to, destruction of or loss of use of, tangible property'"); *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619, 626 (1995) ("the focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses [for] violation of antitrust laws")). In light of the bases for and nature of the losses comprising the MDL 587 awards, *Sola Basic* and *Lucker* do not support plaintiffs' request for property damage coverage.

The Insuring Agreement does not provide coverage where there is no property damage to or actual loss of use of tangible property. In addition, the recoveries were for lost savings, lost investment opportunities and lost profits, all of which are economic losses that do not constitute a covered form of property damage. Under these circumstances defendants owe no duty of indemnification for property damage.

### B. *Advertising Liability*

Plaintiffs assert that the MDL 587 liability constitutes "advertising liability" because B & LE was held liable for "unfair competition ... arising out of ... advertising activities." Plaintiffs note B & LE was held liable for competing unfairly and advance the following argument to support their implicit contention that the term "unfair competition" encompasses conspiracies in restraint of trade designed to preclude

market entry of competitors and attempts to maintain a monopoly through oppressive and coercive conduct. The MDL 587 record establishes that B & LE (1) collected the same dock handling charges for self-unloaders and bulkers and (2) restricted commodity line-haul rates to railroad docks. These charges and rates were announced to the public through the railroad's tariffs, which were used to inform any potential market participants that there would be no financial advantage to using self-unloaders or developing/expanding related services. Handling charges and inland transportation rates were reflected in B & LE's tariffs, and thus the tariffs constituted B & LE's primary form of advertising. Because the tariffs were used to implement the conspiratorial agreement by sending false price signals designed to remove any financial incentives to develop the self-unloader technology, plaintiffs contend that the MDL 587 liability was on account of unfair competition as used in defining "advertising liability" coverage.

Defendants argue that B & LE's tariffs were not a form of advertising because they merely were required regulatory filings and not promotional activities undertaken to generate business. Further, when read in its proper context, the term "unfair competition" does not encompass violations of the antitrust laws, which are designed to protect against injuries to competition in general and the improper manipulation of commerce. Finally, defendants argue that even if B & LE's tariffs are considered to be a form of advertising, there is no causal connection between the established injuries and any advertising or circulation of B & LE's tariffs.

Although plaintiffs' arguments have superficial appeal, they are flawed on multiple levels. First, the record fails to contain sufficient evidence to support the proposition that B & LE's tariffs were a form of advertising. Forms of advertising coverage, and thus an advertising injury creating liability, at their basic level denote a harm committed by the improper use of advertising or a style of doing business. *The Frog, Switch & Manufacturing Co.*, 193 F.3d at 746–50. The overwhelming majority of reported cases have interpreted the plain and ordinary meaning of "advertising" to mean the widespread distribution of promotional material to the public for the purpose of generating business. *See, e.g., Select Design, Ltd. v. Union Mutual Fire Ins. Co.*, 165 Vt. 69, 674 A.2d 798, 801 (1996). Advertising, and advertising activities, "must involve actual, affirmative self-promotion of the actor's goods or services" and a mere motive to maintain business relations or increase business in some tangential way is insufficient to bring tortuous business conduct within the context of affirmative attempts to generate business. *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 894–95 (7th Cir. 1996); *see also Select Design*, 674 A.2d at 801 (collecting cases holding plain and ordinary meaning of "advertising" unambiguously refers to widespread distribution of promotional material designed to generate business); *Bank of the West v. Superior Court of Contra Costa Co.*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 560 n. 9 (1992) (advertising means "widespread promotional activities directed to the public at large"). B & LE was required to "publish and file with the [ICC] tariffs containing [its] rates." 49 U.S.C. § 10762(a)(1) (1982). The filing of tariffs with the ICC was a statutorily required prerequisite to assessing and collecting fees for services. B & LE was obligated to conduct business in a manner which conformed to its established tariffs. Public filing of the tariffs with the ICC was a mere act of acquiring legal approval to charge requested rates, it was not an activity designed to generate business from potential customers.[18] While B & LE's

---

**18.** A similar analogy can be seen between the approval of the rates and charges of a utility company by a state's Public Utility Commission, and the separate promotional materials

tariffs were filed publicly with the ICC, they lacked the character of widespread dissemination of information to the public for the purpose of generating business.

 Second, plaintiffs' attempt to construe the term "unfair competition" as a virtual catch-all for any form of wrongful business conduct is contrary to the natural and ordinary meaning ascribed to that term in the context in which it is used and offends various principles of contract construction. Virtually all jurisdictions to address the area recognize that at its core the phrase covers the common law tort of unfair competition. *See, e.g., Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 550 (collecting cases); *Novell, Inc. v. Federal Ins. Co.,* 141 F.3d 983, 986 (10th Cir.1998); *Curtis–Universal, Inc. v. Sheboygan Emergency Medical Services, Inc., et al.,* 43 F.3d 1119, 1123–25 (7th Cir.1994) (Posner J.). The common law tort of unfair competition generally is understood as the act of passing off one's goods as those of another. *Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 551. This tort developed as an equitable remedy against the wrongful exploitation of trade name and common law trademarks. *Curtis–Universal,* 43 F.3d at 1123 ("Originally, 'unfair competition' just meant the infringement of an unregistered trademark."). Common forms of covered liability include the sale of confusingly similar products and exploiting a competitor's reputation. *Bank of the West,* 10 Cal.Rptr.2d 538, 833 P.2d at 551 (citations omitted); *accord The Frog, Switch & Manufacturing Co.,* 193 F.3d at 747–49 (discussing various forms of "unfair competition" which have been held to be covered advertising injuries).

Moreover, while the outer reaches of "unfair competition" are debatable with regard to the arsenal of claims which can be advanced in the intellectual property are-

na, the context in which the term is used precludes a sweeping expansion of the term to include all forms of modern business torts. The term is used in context with torts such as slander, libel or defamation; infringement of copyright, title or slogan; piracy or idea misappropriation; and invasion of privacy. While these terms have an expansive scope as to competition among competitors regarding representations concerning reputations, identity, quality of goods and services and so forth, it is

> highly implausible to suppose that "unfair competition" in a list of torts otherwise concerned mainly with harmful speech in various forms (defamation, invasion of the right of privacy, copyright infringement) would sweep under the policy a general ... liability for antitrust damages.

*Curtis–Universal,* 43 F.3d at 1123. As Judge Posner further explained, any court should

> have misgivings ... about interpreting "unfair competition" in the policy as broad as it might be interpreted in the modern law of business torts. A word sometimes picks up meaning from its neighbors; and all of the other terms in the list of wrongs insured under the rubric of "advertising injury" concern the misuse of information, as befits the word "advertising." Piracy and the infringement of copyrights, titles (presumably of books, songs, products, services, and so forth), and slogans (advertising and other) are simply different forms of theft (broadly conceived) of information. And defamation involves the use of false information, while invasion of the right of privacy the use of true, although misleading or offensive, information. Libel and slander are the two halves of defamation[.]

the utility company might distribute to the public for the purpose of generating consumption of its services and support for various aspects of its commercial development ventures. While interrelated, the approval of

charges and rates by the Public Utility Commission is a statutory and regulatory prerequisite which remains distinct from the commercial business-generating activities of the utility company.

*Id.* at 1124. What these various offenses have in common "is injury to another that results from the content of statements about the products or services of the insured" and the overwhelming number of jurisdictions refuse to expand the terms beyond their context to the point where "any dispute related to economic competition among businesses is covered by the policy provision for advertising injury." *Select Design, Ltd.*, 674 A.2d at 802–03. For these reasons "the overwhelming majority of courts" have "rejected expansive dictionary definitions of 'unfair competition' that generally encompass harms to the public" and hold that the reasonable expectation of the term is limited to liability synonymous with or at least similar to the common tort of unfair competition. *Keating v. National Union Fire Ins.*, 995 F.2d 154, 155 (9th Cir.1993). While the Supreme Court of Pennsylvania has held in other contexts that a host of various activities can constitute actionable unfair competition and the outer limits of the term have yet to be identified by that court, given the context in which the term is used the reasonable expectations

doctrine cannot be used to expand it to encompass claims by consumers of a company's goods or services who have been injured through fraud or other intentional deceptive trade practices. *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319–20 (3d Cir.1995). The phrase contextually is limited to claims designed to protect a business from another's misappropriation of its business organization or its expenditure of labor, skill or money, *i.e.*, injury to reputation, product, manner of doing business, identification and so forth. *Id.* at 320. No such claim was advanced in the MDL 587 litigation and our task is not to determine whether the term "unfair competition" is ambiguous in the abstract, but instead is limited to determining whether the contract when read as a whole reveals the term is ambiguous as used in the context of defining "advertising liabilities" with regard to the particular set of facts at hand. *Madison*, 735 A.2d at 107. When examined in this manner it is clear that plaintiffs' proposed interpretation far exceeds the acceptable boundaries of the reasonable expectation doctrine.[19]

**19.** While it is quite possible to argue in the abstract that the term "unfair competition" refers to various statutory claims designed to deter deception and fraud on the public, any such contention

is defective as a matter of policy interpretation because it disregards the context. The policy does not purport to cover "unfair competition" in the abstract; instead, it covers "damages" for "advertising injury" caused by "unfair competition." Read in this context, the term "unfair competition" can only refer to a civil wrong that can support an award of damages.

*Bank of the West*, 10 Cal.Rptr.2d 538, 833 P.2d at 545. And awards which seek to return money wrongfully acquired or deter wrongful conduct do not fall within the purview of "damages" as that term is used in insurance policies. *Id.* 10 Cal.Rptr.2d 538, 833 P.2d at 546 (collecting cases). "Damages" in the context of insurance generally is understood to encompass compensation awards for injuries to persons or property as measured by the cost of restoration. While the argument can be made, as plaintiffs suggest, that any award under the antitrust laws merely is designed to compensate the injured

plaintiff having antitrust standing, the purpose of permitting suits for treble damages based upon market exclusion of potential low-cost competitors is to deter conduct which distorts the natural functioning of an economic market and the award in such a case is at least equally designed to transfer ill-gotten gains from those who have violated the law to those who have been deprived of opportunities by that violation. Of course, any such recovery is beyond an insured's reasonable expectation of the purposes of insurance and the meaning of the term "damages." *Id.* 10 Cal.Rptr.2d 538, 833 P.2d at 547–48. *See also O'Neill Investigations v. Ill. Emp. Ins.*, 636 P.2d 1170, 1173–77 (Alaska 1981) (restoration of money acquired through unfair collection practices not award of "damages" as term is used in insurance policy); *Central Dauphin School v. American Cas. Co.*, 493 Pa. 254, 426 A.2d 94, 95–97 (1981) (return of improperly collected taxes not a loss); *cf. Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wash.2d 740, 504 P.2d 1139, 1140–43 (1973) (restoration awards from violation of statutory offense of unfair methods of competition in injunctive

■ Finally, and most importantly, the MDL 587 liability was not caused by B & LE's advertising or its tariffs. Coverage is provided only for those injuries "committed in any advertisement . . . and arising out of . . . advertising activities." Thus, there must be a sufficient nexus between the perpetrated harm and the insured's advertising. When this nexus is not present some courts hold that the prerequisite of advertising has not been established while others hold there is an insufficient causal connection between the insured's advertising and the underlying injury. Plaintiff's evidence is deficient under either approach.

■ Under Pennsylvania law an injury and any resulting liability does not become an advertising activity merely because the insured commits a business tort and then advertises the result. *The Frog, Switch & Manufacturing Co.*, 193 F.3d at 744. In other words, the mere dissemination of wrongful conduct through advertising does not convert the underlying harm into a form of advertising activity. *Id.* In *The Frog, Switch & Manufacturing Co.*, an insured misappropriated a competitor's trade secrets and confidential business information, created a product, and then advertised that product. The insured was sued for theft of trade secrets, unfair competition and false advertising and reverse passing off under the Lanham Act, 15 U.S.C. § 1125(a), which prohibits false or misleading deceptions of fact in commercial advertising. The court held that "to be covered . . ., allegations of unfair competition or misappropriation have to involve an advertising idea, not just a non-advertising idea that is made the subject of advertising." *Id.* at 748. Thus, where the injury arises from a distinct and separate wrong and not from the advertising itself, it is not an injury caused by advertising. *Id.* at 746–48; *accord Select Design, Ltd.*, 674 A.2d at 802–03 (mere tangential connection between underlying tort and general manner of generating business is in-

sufficient justification to manipulate or force-read the policy language to find "advertising" or "advertising injury"); *Novell, Inc.*, 141 F.3d at 986–89 (misappropriation of competitor's product followed by advertising of wrongdoing did not convert underlying claims into advertising injury).

Other authorities similarly recognize that coverage for an enumerated tort only is triggered where there is a causal connection between the underlying harm/injury and the insured's advertising activities. In *Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219 (9th Cir.1996), the court considered whether claims seeking relief for destruction of economic advantage based on misappropriation of trade secrets (theft of a process used to slice fruit) and patent infringement identified injuries potentially within the scope of common law unfair competition where the insured promoted its "new" process to increase its production. Applying the principle that "any 'advertising injury' must have a causal connection with the insured's 'advertising activities' before there can be coverage," the court focused on the underpinnings of the claims and held they were independent of any advertising activities. Exploiting the wrongful conduct through promotional activity was insufficient because "advertising activities must cause the injury—not merely expose it." *Id.* at 1221–1223 (*citing, inter alia, Microtec Research, Inc., et al. v. Nationwide Mutual Ins. Co., et al.*, 40 F.3d 968 (9th Cir.1994)); *see also Novell, Inc. v. Federal Ins. Co.*, 141 F.3d 983, 988 (10th Cir.1998) (advertising injury is not established where insured merely advertises competing product allegedly gained by misappropriation); *Robert Bowden, Inc. v. Aetna Cas. & Sur. Co.*, 977 F.Supp. 1475, 1479 (N.D.Ga.1997) ("the overwhelming majority of courts which have addressed the issue have held that there must be a causal connection between an insured's advertising and the alleged

action by state attorney general not damages within meaning of insurance policy).

injury").[20]

Here, even assuming B & LE's tariffs constituted a form of advertising, the MDL 587 liability was not based upon nor did it arise from the rates and charges established by those tariffs. B & LE enjoyed ICA immunity with regard to its rates and charges, and the tariffs reflecting those rates and charges had to be accepted as lawful and reasonable. *In re Lower Lake Erie*, 998 F.2d at 1159. The jury specifically was instructed that it could not find liability based upon any rate-related activity leading to a duly filed tariff. It was the railroads' collective refusal to (1) permit the unrestricted sale or lease of dock property and (2) implement lower rates for handling ore shipped on self-unloaders as well as their boycott of private docks and refusal to establish lower line-hauling rates from those docks that gave rise to the recoverable "damage claims based on non-rate activity that targeted potential low-cost competitors." *Id.* at 1159. It was the affirmative "evidence of the railroads' refusal to handle self-loaders at their docks, restrictions on the sale and lease of dock property to unregulated entities, boycotts of unregulated docks, and intra-industry

coercion claims" which constituted the core underpinnings of the MDL 587 liability. *Id.* at 1160. It was this activity, in conjunction with collective coercion to perpetrate it, that caused the injuries not barred by ICA immunity.

It is beyond question that there was no advertising idea forming any element of the MDL 587 plaintiffs' claims of recovery and the underlying liability and damages arose solely from conduct necessarily independent and unrelated to any claimed advertising. The MDL 587 plaintiffs were barred as a matter of law from recovering on claims of improperly inflated rates and charges. Under these circumstances, the fact that B & LE's tariffs may have been used in some tangential manner to further the goals of the conspiracy or calculate the quantum of recoverable damages sustained by the steel companies does not convert the underlying liability into a form of advertising liability under Pennsylvania law. *Compare The Frog, Switch & Manufacturing Co.*, 193 F.3d at 744. For these same reasons the requisite nexus to advertising activities is virtually nonexistent. *Id.* at 750 n. 8. Pennsylvania law does not impose

---

**20.** The Third Circuit has suggested, albeit in *dicta*, that a causation analysis should not simply inquire into whether the underlying tort occurred independent of the insured's advertising, but instead should focus on whether the insured's advertising itself caused an actionable harm which became a substantial factor in bringing about the third-party's injuries. Because the court resolved the issues before it in *The Frog, Switch & Manufacturing Co.* by a straightforward determination that the underlying complaint did not allege advertising injury, it did not definitively resolve the insurer's arguments that there was no causal connection between the insured's advertising activities and the third-party's alleged injuries. Chief Judge Becker nevertheless observed that a number of courts "have conflated the requirement of 'advertising injury' as defined in the standard policy with the requirement that the injury occur in the course of advertising, with the unfortunate result that they have distorted standard causation principles." The court opined:

> Some courts have solved the problem by requiring that the injury be complete in the

advertisement, requiring no further conduct. *See, e.g., Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 339 n. 3 (9th Cir.1996) (discussing California approach); *Dogloo*, 907 F.Supp. at 1390 ("the cases ... illustrate that advertising injury coverage does not extend to cases in which advertising alone is not actionable."). *We believe this formation is a reasonable way to limit the scope of causation.* Thus, if an advertisement invaded a person's privacy (causing an advertising injury), and the insured's product also invaded a person's privacy (causing an advertising injury), the advertisement would cause part of the total harm and would constitute a complete tort in itself. In such a case, we think that there would be a duty to defend. *See id.* The duty to indemnify, however, would be limited to the harm caused by the advertisement.

*Id.* (emphasis added). Thus, the causation question is not whether the injury could or would have occurred without the advertising, but instead is whether the advertising activity was a complete and actionable injury in itself.

an obligation of indemnification on defendants under such circumstances.

## C. *Personal Injury*

 Plaintiffs' effort to establish that the liability was imposed on account "personal injuries" fails for similar reasons. Plaintiffs observed that " 'personal injuries' " is defined to "mean ... discrimination ..." and advance essentially the following in support of this theory:

> The lead witnesses for the London defendants uniformly acknowledged that liabilities arising out of "economic discrimination" were within the general scope of "discrimination" coverage and that the policies issued to USX expressly excluded coverage for "discrimination ... because of race, creed, color or national origin." The Fifth Edition of *Black's Law Dictionary* defines "discrimination" in the context of a common carrier as "a breach of the carrier's duty to treat all shippers alike" and further defines "economic discrimination" to mean "[a]ny form of discrimination within the field of commerce." *Black's Law Dictionary*, 420 & 460 (5th ed.1979). "Price discrimination" is defined as occurring where "a buyer pays a price that is different from the price paid by another buyer for an identical product or service [which] is prohibited if the effect of this discrimination may be to lessen substantially or injure competition...." *Id.* at 1070. There also are similar definitions in the 1934 edition of *Webster's New International Dictionary* and the 1981 edition of *Webster's Third New International Dictionary* defines discrimination as

> > the act, practice or an instance of discriminating categorically rather than individually— ... b. the act or practice on the part of a common carrier of discriminating (as in the imposition of tariffs) between persons, localities, or commodities in respect to substantially the same service....

*Webster's Third New International Dictionary*, 648 (1981). This definition parallels the treatment of "discrimination" as used in the ICA, *see* 49 U.S.C. §§ 2, 3, and the United States Court of Appeals for the Seven Circuit has held that the term "discrimination" as used in the definition of "personal injury" can encompass a claim for "price discrimination." *See Federal Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563 (7th Cir.1997) (beer manufacturer's staggered price discount for volume purchases challenged in complaint alleging price discrimination against small wholesalers under Robinson–Patman Act and Indiana beverage laws recognized as a covered form of price discrimination).

From these premises plaintiffs argue that the term "discrimination" can only be understood as covering "the predominate type of discrimination for which B & LE, as a common carrier railroad, could be found liable."

Plaintiffs then advance the following to support their contention that the MDL 587 litigation was a classic tale of economic and price discrimination:

> "To redress the resulting injury to competition, the MDL 587 plaintiffs chose to assert their legal claims under federal and state antitrust laws, although full remedies for discriminatory rate actions, including damages, were available under the [ICA] and the common law." The various complaints alleged facts which would have supported causes of action under the ICA's prohibitions against "carriers ... charging different rates for doing like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions," *Atchison, Topeka and Santa Fe Ry. Co. v. United States*, 549 F.2d 1186, 1188–89 (8th Cir. 1977), and the ICC was authorized to investigate such claims of discrimination and to enjoin any violation of the ICA, which prohibited any railroad rate or charge from being unjustly discriminato-

ry. In addition, the ICC was directed through the National Transportation Policy to prevent all "unfair or destructive competitive practices." *See* 49 U.S.C. §§ 8, 9, 13(1)–(2), 16(1) (repealed 1996). The underlying complaints actually alleged "defendants instituted a policy of rate discrimination" and the MDL 587 plaintiffs proved the actionable restraint of trade was implemented by discriminatory (1) decisions to apply the same service charges for self-unloaders and bulkers, (2) refusals to make available lower transportation rates for ore shipped to private docks and (3) refusals to sell or lease property for use as a private dock.

Plaintiffs then argue:

[t]he fact that the MDL plaintiffs chose to bring a treble damage action under federal and state antitrust laws rather than an action under the ICA does not alter the nature of the underlying course of conduct for which coverage is sought. Nor does the MDL plaintiffs' choice of legal theories determine whether the policies cover B & LE's MDL liability.

Plaintiffs' Memorandum in Support (Document No. 451) at p. 26 n. 17.

Because various facets of the conspiracy may have supported a claim for discrimination under the ICA and were implemented through the railroads' failure to draw meaningful distinctions between various services, which the juries found could have and should have been drawn, plaintiffs argue that the liability was imposed on account of discrimination within the meaning of "personal injuries." [21]

The defendants contend that the MDL 587 plaintiffs legally were precluded from presenting to the jury any claims for "discrimination" under the ICA and the court's

charge and the juries' verdict did not establish any findings which would establish such a claim. Defendants specifically assert that any such claim was precluded by the doctrine of primary jurisdiction under the ICA and that it is entirely speculative to embark on an attempt to transform the underlying liability into an ICA claim for discrimination. Similarly, they contend that common law discrimination could not be established as a matter of law.

The context in which the term "discrimination" is used once again sufficiently undercuts plaintiffs' attempt to rewrite the policy under the reasonable expectations doctrine and principles of insurance law regarding ambiguities. It may be as the majority stated in *Stroh Brewing* that "[t]ime was, 'discrimination' might have brought immediately to mind charging one person more than another for the same product." *Stroh Brewing*, 127 F.3d at 564. To suggest, however, that the use of that term in defining "personal injuries" was intended to identify a distinct form of statutory liability created 85 years ago by the Sherman Act and commonly known as "antitrust liability" stretches the term beyond any natural and ordinary meaning to be gleaned from its use in context. The term is preceded by "false arrest, false imprisonment, wrongful eviction, detention [and] malicious prosecution" and is followed by "humiliation [and] libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities." The terms preceding the phrase identify offenses against the individual for wrongful deprivation of liberty or interference with the right to peaceful possession of property and those that follow it identify common offenses which injure the character or reputation of an individual. Of course, "dis-

---

21. Plaintiffs also assert that the railroads' conduct could have been pled as a common law claim for unjust discrimination in light of the Supreme Court of Pennsylvania's recognition in *Schwartz v. Laundry & Linen Supply Drivers' Union*, 339 Pa. 353, 14 A.2d 438 (1940), that the federal antitrust laws codified the common law doctrine of restraint of trade in the field of interstate commerce. Prior to the Sherman Act Pennsylvania common law recognized a cause of action for unjust discrimination in *Borda v. Philadelphia & Reading R. Co.*, 141 Pa. 484, 21 A. 665 (1891).

crimination" and its companion "humiliation" are forms of disparate or demeaning treatment of persons commonly accomplished through unjust economic treatment, and such terms are indeed related to forms of "mental injury, mental anguish [and] shock" as their contextual placement within the policy demonstrates. And price discrimination claims may well be analogous to this understanding in certain settings. But to suggest that hiding among these causes of harm to the person included in personal injury coverage is a form of discrimination which encompasses broad-based economic practices which injure markets through the improper elimination of competition accomplished by purposeful manipulation of goods and services reflects a highly implausible definition or meaning of that term.

Moreover, grants of coverage in a standard CGL policy are designed and intended to identify categories of claims which commonly are asserted against a broad class of potential insureds. To suggest that it is reasonable to assume that a term has suddenly undergone a metamorphosis and transformed itself into a claim unique to large common carriers governed by the ICA, which would be a minute fraction of the potential consumers of the insurance industry, is at the least extraordinary. We venture to suggest that a sophisticated commercial entity such as USX, which listed a significant number of named insureds on its application, would be surprised to learn in the application process that the term "discrimination" as used in the context of "personal injuries" was a synonym for distinct statutory claims under the ICA or general claims under the antitrust laws, and by implication that part of its premium dollars would be spent protecting other insureds from these types of claims. Furthermore, the partial exclusion of certain forms of discrimination in the policies did not undermine the ordinary and natural meaning of the term or reduce the coverage to only that form of discrimination advanced by plaintiffs. The exclusion merely eliminated the most invidious forms of discrimination: those based on race and national origin. There is no question that at a minimum coverage for discrimination against individuals based on gender, religion, and age remained. When a court is confronted with allegations of ambiguity based upon a reading of a phrase which is divorced from its contextual use, the requirement that the two competing interpretations both be reasonable is not satisfied and it is improper to attempt to shoehorn the language or otherwise use a contrivance to create coverage where the plain language suggests none was intended. *See, e.g., Madison Construction Co.,* 735 A.2d at 106–07; *Peerless Ins. Co. v. Wells,* 154 Vt. 491, 580 A.2d 485, 488 (1990) (ambiguity not created by differences in conclusions reached by courts where alternative meaning is based on contrived and forced reading of policy language); *Curtis–Universal,* 43 F.3d at 1123–25 (a meaning ascribed to policy term will not be a reasonable interpretation where that meaning is divorced from the term's contextual usage and the common understandings in the industry).

Even assuming *arguendo,* however, that the term is ambiguous and reasonably capable of encompassing some forms of broad-based price discrimination against commercial entities, a second fundamental shortcoming with plaintiffs' arguments on this score is that this court does not now have the liberty to recharacterize the underlying liability into a group of facts which may potentially support a claim for coverage under a hypothetical set of circumstances. When the ten actions were filed between 1982 and 1984, the ICA contained two provisions prohibiting discrimination. The ICA provided:

> A [railroad] ... may not charge or receive ... a different compensation (by using a special rate, rebate, drawback or other means) for a service rendered ... in transportation the [railroad] may perform under this subtitle than it charges or receives from another person for per-

forming a like or contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances. A [railroad] that charges or receives such a different compensation for that service unreasonably discriminates.

49 U.S.C. § 10741(a) (1982). The second provision provided: "a [railroad] . . . may not subject a person, place, port or type of traffic to unreasonable discrimination." 49 U.S.C. § 10741(b) (1982).

Judge Fullam did not charge the juries to consider whether B & LE committed the elements of ICA discrimination. To the contrary, B & LE's § 5(a) immunity under the ICA and the *Keogh* doctrine precluded as a matter of law any claim based on the theory that the rates charged were improper or otherwise discriminatory and all claims based on the rates charged by the railroads were dismissed. The relevancy of the allegations in the complaints to this effect likewise then dropped from the case. Furthermore, B & LE argued in the (1) criminal proceeding, (2) district court civil proceeding and (3) civil appellate proceeding that the claims against it could only be brought under the ICA and therefore the ICC had initial jurisdiction over the claims under doctrine of "primary jurisdiction." *See Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943 (1922) ("whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory [under the ICA], there must be preliminary resort to the Commission . . . because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission"); *Keogh*, 260 U.S. at 164, 43 S.Ct. 47 (the ICC "must determine whether a rate is discriminatory; at least, in the first instance").

The proposition that B & LE's liability was not price discrimination under the ICA or predicated on a synonymous theory conclusively is established in the MDL 587 record. Indeed, "[i]n a series of pre-trial rulings, the district court dismissed the steel companies' claims for damages based on the allegation that, absent the conspiracy, these plaintiffs would have paid lower rates for costs associated with the transportation of ore." *In re Lower Lake Erie*, 998 F.2d at 1154. The damage claims by the steel companies that were considered by the jury were based upon the "defendants' elimination of competitive non-railroad dock facilities," which were not "rate-related, because they required proof that the defendants conspired to exclude low cost competitors from the market" and the dock and trucking companies' claims were those of the competitors excluded from the market. *Id.* In contrast, the steel companies' claims that they would have paid vessel companies a lower rate for lake transportation absent the conspiracy also were dismissed as potentially duplicative and speculative. *Id.* As a result, the damage claims which survived were limited solely to B & LE's anticompetitive market-exclusion activities. In judicially concluding that the recoveries were independent of price or rate discrimination under the ICA, the Third Circuit explained:

> [w]e recognize that the success of anticompetitive non-rate activity would coincidentally implicate rates promulgated under the jurisdiction of the ICC. It is fully consisted with *Keogh*, however, to accept these rates as lawful and nonetheless to conclude that through non-rate activities, particularly the restriction on the sale or lease of dock space and the refusal to deal with potential competitors, the railroads effectively retarded entry of lower cost competitors into the market. The instrument of damage to the steel companies was the absence of the lower-cost combination. . . .

> \* \* \* \* \* \*

The proof required to show the harm alleged here thus differs from that deemed objectionable in *Keogh*. In this case, the plaintiffs showed that the rail-

roads conspired to protect their stronghold in the ore transportation market by blocking entry by low-cost competitors, *not that the railroads charged an unlawful rate.*

*Id.* at 1159 (emphasis added). B & LE repeatedly argued that the claims against it were based on rate-setting activities and initial jurisdiction over them belonged with the ICC; repeatedly B & LE's argument was found to be unavailing with regard to the market exclusion claims which reached the jury. *Id.* at 1162–63.

Finally, and importantly, while B & LE did discriminate against private docks by withholding its services and/or refusing to provide lower rates or charges for the services it rendered, liability was not imposed for this conduct because B & LE had a legal right to engage in this conduct on its own. Liability was imposed for its knowing and intentional participation with others in an illegal conspiracy, a matter wholly separate and distinct from any decision it made on its own to withhold services or maintain its established rates. It is thus beyond question that any theory of economic discrimination in the setting and collecting of rates and charges was not a basis for the MDL 587 liability and damages.

 Under Pennsylvania law an insurance contract which requires covered "damages" to "arise out of" certain specified forms of tort liability obligates the insured to establish "but for" causation. *Roman Mosaic & Tile Co. v. Aetna Cas. & Sur. Co.,* 704 A.2d 665, 669 (Pa.Super.1997). In other words, "[c]onstrued strictly against the insurer, 'arising out' means causally connected with, not proximately caused by." *Id.* at 669 (*citing, inter alia, Manufacturers Cas. Ins. Co. v. Goodville Mutual Cas. Co.,* 403 Pa. 603, 170 A.2d 571 (1961)). Thus, an insurer's duty of actual indemnification is triggered only when the essential elements of the claims established arise out of the specific torts enumerated in the policy or ones synonymous therewith. *Id.* The mere identification of an item of damage (*i.e.* bodily injury, mental anguish and so forth) which is not causally connected with and integrated into a claim covered by the policy is insufficient to trigger the insurer's duties thereunder. In light of (1) the claim of recovery in MDL 587, (2) the nature of the factual allegations established in support thereof and recovered upon, (3) the essential elements establish by the juries and (4) the circumscribed scope of damages recovered, both the contract law of indemnity agreements and the principles of *res judicata* preclude this court from recharacterizing that liability into a different theory of covered liability not established by the judgments upon which plaintiffs found their claims for indemnification. *Builders Supply Co.,* 77 A.2d at 373; *Murphy Oil,* 962 S.W.2d at 740; *Madison,* 735 A.2d at 109 (emphasizing that "arising out of" as used in insurance policy signifies a "but for" or "cause and result" relationship) (*citing in support McCabe v. Old Republic Ins. Co.,* 425 Pa. 221, 228 A.2d 901, 903 (1967)); *Springfield Twp. v. Indemnity Ins. Co. of North America,* 361 Pa. 461, 64 A.2d 761, 762 (1949) (it is the "nature of the claim" which determines whether the insurer's duties have been triggered). It follows that defendants owe no duty of indemnification for personal injury liability.

### D. *An Occurrence*

Plaintiffs contend the MDL 587 liability arose from "an occurrence" as defined under Pennsylvania law and advance the following in support. The occurrence was "the agreement, its implementation and the continuous exposure to the anticompetitive conditions arising therefrom," which in turn produced a non-linear, progressive economic injury resulting in unexpected and unintended damages. The "accidental"/"unintended and unexpected" limitation in the definition of occurrence does not preclude coverage because numerous intentional business torts are covered by the Insuring Agreement and B & LE's

intent to violate the antitrust laws was not an issue in the MDL 587 litigation. Any public policy defense is strong medicine which is disfavored and applicable only in the clearest cases. Thus, because B & LE had numerous defenses to the claims and did not expect or intend the resulting losses, the fortuity requirement is satisfied.

Defendants' contend that antitrust liability imposed for restraint of trade and monopolization epitomizes the essence of intended and inspected harm and a nonfortuitous loss, thus precluding coverage under the definition of occurrence and creating liability which is uninsurable as a matter of Pennsylvania public policy. Defendants once again argue the MDL 587 record conclusively demonstrates that this essential term cannot be established.

■ The Insuring Agreement defines an occurrence as

an accident, ... happening, ... event, or ... exposure to conditions, which unexpectedly and unintentionally results in a [covered form of damage/injury] during the policy period.

Pennsylvania law has long recognized that this definition requires an accidental event or happening with an element of fortuity. *Gene's Restaurant, Inc. v. Nationwide Ins. Co.*, 519 Pa. 306, 548 A.2d 246, 247 (1988). Generally focusing on the cause of the loss is the primary inquiry in determining the existence of an occurrence. *D'Auria v. Zurich Ins. Co.*, 352 Pa.Super. 231, 507 A.2d 857, 860–61 (1986) ("The general rule is that an occurrence is determined by the causes of the resulting injury."). Thus, there must be an accident or fortuitous event which causes a covered loss.

Plaintiffs devote considerable effort in demonstrating that antitrust liability in and of itself is not *per se* uninsurable and that other courts have recognized that claims of antitrust liability can trigger an insurer's duties to defend and indemnify. *See Stroh Brewing*, 127 F.3d at 568 (claims by single small distributor against single manufacturer based on volume discount pricing under Robinson–Patman Act, which "prohibits discrimination generally," triggered personally injury coverage because claims were common in industry of insured which often utilized legal cost-justified quantity discounts); *Ethicon, Inc. v. The Aetna Cas. and Sur. Co.*, 737 F.Supp. 1320, 1328 (S.D.N.Y.1990) (common law claim for malicious prosecution styled as antitrust claim triggered coverage under personal injury, which included malicious prosecution claim coverage). With this general proposition we do not disagree. The task at hand, however, is not to determine theoretically whether some forms of antitrust liability may be fortuitous and sufficiently analogous with state law claims that are covered in some fashion under some of the various policy forms in circulation; instead, our course necessarily entails an application of the policy language and Pennsylvania law to the underlying liability for which coverage is sought.[22]

■ As an initial matter, the parties dispute who bears the burden of proving the fortuity or lack thereof of the loss.

**22.** Plaintiffs' argument regarding the lack of an antitrust exclusion is without force for the same reason. Plaintiffs assert that the lack of an antitrust exclusion in the policies, coupled with the industry's drafting and incorporation of such an exclusion as early as 1988, supports their arguments for coverage because if there was no intent to provide coverage for conduct giving rise to antitrust liability, then no exclusion would be necessary, or at a minimum the subsequent addition of an antitrust exclusion reveals the policies were ambiguous and an insured reasonably could expect such liabilities to be covered. In addition to the hypothetical nature of this argument, the almost infinite number of possible scenarios which could arise in intellectual property disputes involving competition and advertising, particularly in more recent times, could easily explain the use of such an exclusion. In all events, the question is whether the Insuring Agreement covers the antitrust liability imposed against B & LE and relying on a negative inference does little to advance plaintiffs' affirmative obligation to establish the loss is covered by the grant of coverage.

The fortuity requirement in the Insuring Agreement is expressed in the definition of occurrence, which requires the accident or event causing the liability to be unintended and unexpected. Defendants argue the insured should bear the burden of proving this requirement because it is straightforwardly set forth in the affirmative grant of coverage. In contrast, plaintiffs argue that the "unexpectedly and unintentionally" provision is a limitation on coverage, the proof of which properly is assigned to defendants.

 The rule of fortuity embodies a fundamental principle of Pennsylvania public policy "not to enforce an insurance coverage contract providing coverage for a non-fortuitous loss." *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1447 (3d Cir.1996). And where there is at least a prima facie basis upon which to argue that a loss is fortuitous, the burden is shifted to the insurer to demonstrate that the loss falls outside the scope of coverage or is otherwise uninsurable as a matter of public policy. *Id.* Because we agree with plaintiffs' general contention that there are many forms of antitrust liability and a claim labeled as such is not necessarily precluded from being within the scope of an insurance policy, *see Curtis–Universal*, 43 F.3d at 1125 (rejecting argument that price-fixing claim in complaint which also contained covered advertising injury claim necessarily alleged antitrust criminal activity), the burden properly is placed on defendants to demonstrate the loss was non-fortuitous or the coverage sought is contrary to public policy. *But see Gene's Restaurant*, 548 A.2d at 247 (treating potential liability from intentional tort as failing to establish fortuitous character of an accident); *Erie Ins. Group*, 102 F.3d at 893 (where language is in coverage grant and serves to define scope and purpose of provision, insured has burden to prove provision applicable).

 In construing policy provisions limiting coverage for intentional acts, the Supreme Court of Pennsylvania has drawn "a very real distinction between intending an act and intending a result" and has opined that such provisions do not address intentional acts in themselves, but instead are concerned with damage or harm intentionally caused by the insured. *Eisenman v. Hornberger*, 438 Pa. 46, 264 A.2d 673, 674 (1970) Thus, "before the insurer may validly disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur." *Id.*

 More recently, Pennsylvania courts follow the decision in *United Services Automobile Assoc. v. Elitzky*, 358 Pa.Super. 362, 517 A.2d 982 (1986), *appeal denied*, 515 Pa. 600, 528 A.2d 957 (1987), in determining whether coverage is excluded under an intentional act limitation. *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 460 (3d Cir.1993). *Elitzky* established four important principles. A clause excluding coverage for intended or expected events "is ambiguous as a matter of law and must be construed against the insurer." *Elitzky*, 517 A.2d at 989. Clauses of this nature exclude "only injury and damage of the same general type which the insured intended to cause [and an] insured intends an injury if he desired to cause the consequences of his act or if he acted knowing that such consequences were substantially certain to result." *Id.; see also Aetna Cas. & Sur. Co. v. Roe, et al.*, 437 Pa.Super. 414, 650 A.2d 94, 100 (1994) ("An insured intends an injury if he/she desires to cause the consequences of his/her act or if he/she acted knowing that such consequences were substantially certain to result.") (*quoting Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 618 A.2d 945, 953 (1992), *appeal denied*, 536 Pa. 630, 637 A.2d 290 (1993)). In other words, under Pennsylvania law "it is not sufficient that the insured intended his actions; rather, for the resulting injury to be excluded from coverage, the insured must have specifically intended to cause the harm." *Id.* (*citing in support Eisenman*, 264 A.2d at 674–75). The "expected"

component of the phrase denotes "an element of conscious awareness on the part of the insured" and therefore "intended" and "expected" "are synonymous for the purposes of insurance exclusionary clauses." *Elitzky*, 517 A.2d at 990. And, for the purposes of enforcing such clauses, Pennsylvania's public policy is coterminous with the force and effect of the exclusionary clause. Thus, under Pennsylvania law a subjective standard applies which is dependent upon whether the insured intended to cause damage of the same general type for which he has been held accountable. *Id.; Aetna Life and Cas. Co. v. Barthelemy*, 33 F.3d 189, 191 (3d Cir.1994) (Pennsylvania applies "subjective intent" analysis).

▉ Whether an event was fortuitous or expected and intended is assessed from the standpoint of the insured. *Nationwide Mut. Fire Ins. Co. v. Pipher*, 140 F.3d 222, 227 (3d Cir.1998). Although the subjective standard imposes a heavy burden on an insurer, consideration of the nature of the third-party's injury is essential and certain intentional torts such as assault and battery demonstrate an intent to produce a general type of harm which is controlling in the particular case. *Gene's Restaurant*, 548 A.2d at 247 (malicious, willful assault and beating can never be an accident). In other situations intent to harm may presumptively arise if the insured is held liable for a claim that contains elements which inferentially establish an intent to harm, but such a determination is appropriate only where any potential liability for recklessness or negligence under the same cause of action advanced against the insured has been eliminated. *Elitzky*, 517 A.2d at 989. For example, where an insured is held liable for intentionally defaming another with statements the insured knows to be false, "an intent to harm might be presumed." But where it is "possible that the [insured] recklessly disregarded the truth and libeled [the third-party] yet did so with [a] pure heart," the insurer may be called upon to defend the defamation action. *Id.* In making an as-

sessment in any particular situation the probability that certain consequences will follow from a particular act is an important aspect of the analysis. *Id.* (*citing* Restatement (Second) of Torts, § 8A).

▉ The fact that the insured has pled guilty to a crime does not necessarily bar coverage where the elements do not establish that the insured intended to cause the harm resulting from the criminal act. *Stidham*, 618 A.2d at 952; *Eisenman*, 264 A.2d at 674–75 (insured's burglary of home not a bar under intentional acts exclusion where resulting damage arose from unintentional fire caused by use of matches to see at night). Any criminal conduct to which the insured has pled guilty may be considered, however, and such convictions are conclusive evidence of the criminal acts established by the prosecution. *Stidham*, 618 A.2d at 952. Even where the insured has pled guilty to a crime, however, *Elitzky*'s subjective intent analysis remains relevant and careful consideration must be given to what the record does and does not establish. *Wiley*, 995 F.2d at 466–67. Inferring subjective intent is inappropriate where the underlying conduct merely is capable of being construed as a criminal act but material issues exist regarding the insured's subjective intent to cause the harm. *Barthelemy*, 33 F.3d at 192–93. Similarly, the subjective intent standard is not met where an insured negligently violates a federal civil statute in good faith. *BLaST Intermediate Unit 17 v. CNA Ins. Companies*, 544 Pa. 66, 674 A.2d 687, 691 (1996) (insurance indemnification for "negligent but good faith violation of the Equal Pay Act" does not violate Pennsylvania's public policy prohibiting insurance recovery for intentional violation of a statute).

The Supreme Court of Pennsylvania has considered the rule that public policy does not permit insurance coverage for non-fortuitous losses in four cases. In determining whether public policy precludes coverage for the act in question, the court

has considered the following common factors:

1) whether gain was derived from an illegal act or the insured suffered a loss by being legally required to compensate an injured third party;

2) whether permitting coverage would encourage others to engage in intentional unlawful activity for the purpose of reaping a benefit; and

3) whether permitting recovery would permit the insured to escape the consequences flowing from criminal or intentional and malicious conduct.

See *Gene's Restaurant, Inc. v. Nationwide Ins. Co.*, 519 Pa. 306, 548 A.2d 246, 247 (1988); *BLaST*, 674 A.2d at 690–91; *Eisenman*, 264 A.2d at 675; *Central Dauphin School*, 426 A.2d at 96–97.

Relying on *BLaST* and *Eisenman*, plaintiffs argue that the MDL 587 record demonstrates B & LE had a good faith belief that it was acting in compliance with the law. To support this proposition plaintiffs' reference the following. Judge Fullam made a post-trial finding in denying the MDL 587 plaintiffs' request for prejudgment interest under the Ohio Valenteen Act that B & LE may well have entertained the good-faith belief that it had meritorious defenses to the liability. He explained:

In the circumstances of this litigation, [B & LE] could well have entertained a good-faith and not unreasonable belief that it had no liability to the plaintiffs. Although the evidence of the overall conspiracy among the defendant railroads was compelling, most of that evidence related to the pre-limitations period, and very little of it related to defendant B & LE. There was a legitimate argument that, regardless of the improprieties which may have been committed by the other railroads, the B & LE was not guilty of anticompetitive conduct.

*In re Lower Lake Erie*, 759 F.Supp. at 234. The Third Circuit "agree[d] with the district court that B & LE had a reasonable expectation that it would not be liable to the plaintiffs." *In re Lower Lake Erie*, 998 F.2d at 1181. This finding reflected that some of the evidence in the MDL 587 record supported B & LE's contentions that it was not guilty of the conspiracy or otherwise withdrew from it prior to the four-year statute of limitations period by reserving the right to take independent action. In addition, the railroads' motives "to preserve the status quo" and "justify their continued capital investment" in the existing systems can support an intent which was not coextensive with a desire to harm the MDL 587 plaintiffs, particularly in light of the fact that the Sherman Act's prohibition against restraints of trade is designed to protect competition, not specific competitors. Based on these general premises plaintiffs argue that "the MDL 587 record demonstrates only that B & LE believed, in good faith, that the 'restraint of trade' and 'monopolization' of the market in which it participated was a permissible restraint of *competition* in the iron ore transportation market" and under such circumstances B & LE did not have any intent to cause legal injury to anyone. Plaintiffs' Brief in Opposition (Document No. 483) at p. 36.

■ The requirement that the loss arise from an occurrence cannot be demonstrated for two reasons. First, the MDL 587 record establishes a presumption of B & LE's intent to cause the same general type of harm which gave rise to the liability and recoveries and plaintiffs have failed to produce sufficient evidence to overcome that presumption. In addition, permitting plaintiffs to shift their loss to defendants would offend Pennsylvania's public policy.

The issue of whether B & LE had the specific intent to violate the antitrust laws misses the point. The question is whether B & LE intended to produce the same general type of harm which caused the resulting injuries. The jury's verdict and applicable law demonstrate that it did.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination

... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To sustain a cause of action under § 1, the plaintiff must prove: "(1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992) (*quoting Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978)). "The very essence of a section 1 claim, of course, is the existence of an agreement" and liability is predicated on the actors' concerted action. *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994), *cert. denied*, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). The antitrust plaintiff must prove that the defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (*quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980) (Aldisert, J.)), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *see also Alvord–Polk*, 37 F.3d at 1001.

 Section 2 of the Sherman Act provides in pertinent part:

Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a felony....

15 U.S.C. § 2. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1991) (*quoting United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). "Monopoly power consists of the ability to control prices or exclude competition from the relevant market." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 154 (3d Cir.1981) (*citing Grinnell*, 384 U.S. at 571, 86 S.Ct. 1698); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Establishing the defendant's "specific intent to monopolize the relevant market is a necessary element of conspiracy to monopolize." *Fleer Corp.*, 658 F.2d at 154 (*citing Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)); *see also Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 807 (3d Cir.1984) ("specific intent is an element of a conspiracy to monopolize").

The MDL 587 jury necessarily found each of these elements, including B & LE's conscious commitment to advance various facets of the scheme designed to exclude potential low-cost competitors and an intent to monopolize the relevant market through non-rate related illegal activity. Judge Fullam instructed the jury on several key points which reflect these issues:

A conspiracy is an agreement or understanding between two or more people to do an unlawful act, to do something which the law prohibits;

That the plaintiffs had to show there actually was an agreement or mutual understanding to restrain trade in the particular market;

In order to become a member of the conspiracy, knowing participation must be shown;

In order for B & LE to be held liable under either § 1 or § 2 of the Sherman Act, B & LE had knowingly and voluntarily and intentionally become a party to the agreement or mutual understanding to restrain trade;

B & LE could not be held liable by mere knowledge of or association with railroads which B & LE knew were doing something illegal;

And B & LE had to have committed at least some of the acts in furtherance of the conspiracy within the statute of limitations period and without a good faith belief that it was carrying out the policies of the ICC or otherwise entertaining a good-faith belief that it was acting within the scope of its ICA immunity.

*See* Charge of the Court at pp. 8–50, Defendants' Appendix at pp. 119–161. In clarification Judge Fullam explained:

In order to become liable for a conspiracy to violate the antitrust laws, it must be shown that the *defendant knowingly and intentionally became a member* of the conspiracy. It is not necessary that each act taken by the defendant that the defendant must know that it violated the antitrust laws. What it must show, however, is it knowingly participated in the act with knowledge that it would take place to the extent of its own actions and *it must know that its conduct would have the effect of restraining trade.*

\* \* \* \* \* \*

But if the railroad [ultimately] reached a decision to carry out that agreement, they would be liable for the antitrust violation, even though the person who initially discussed it may not have been fully aware of the implications of the antitrust laws. *It must be shown that they acted knowingly with knowledge of the object to be achieved.* And whether they knew that object was illegal or not is not the key issue.

*Id.* at 73–74 (emphasis added), Defendants' Appendix 184–85. Through specific inter-

rogatories the liability jury determined that B & LE knowingly participated in a conspiracy to restrain trade in violation of Section 1 of the Sherman Act and to monopolize in violation of Section 2 of the Sherman Act; B & LE committed acts in furtherance of the conspiracy without a good-faith belief that its acts were required by ICC regulation or its conduct was reasonably justified under the regulatory policies which governed B & LE's operations. *See* Questions to be Answered by the Jury 1, 2, 19 & 20, Defendants' Appendix at 99 & 111.

Moreover, plaintiffs' reliance on Judge Fullam's ruling in denying prejudgment interest under the Ohio Valenteen Act is unavailing. The liability against B & LE could not have been established unless it became a knowing participant in a conspiracy which had the objectives of restraining trade and maintaining a monopoly over the inland transportation of ore. In a contested setting the jury specifically was requested to pass on B & LE's contentions that it had a good faith and reasonable basis for believing that its conduct was "consistent with the overall policies of the ICC and, therefore is not to be punished and not in violation of the antitrust laws," Charge of the Court at 48, Defendants' Appendix at 159, and the jury found that specific acts by B & LE taken in furtherance of the conspiracy were done without a good-faith belief or a reasonable basis to believe they were protected by the regulatory climate in which B & LE operated. Judge Fullam explained:

Literally thousands of documents, from the railroads' own files, establish beyond dispute the existence of an illegal conspiracy, dating back to at least 1950, to prevent self-unloading vessels, private docks, and trucking firms from gaining a foothold in the transportation of ex-lake iron ore. The record is so clear and complete, in fact, that it can be read to suggest that the participants may have genuinely believed that the antitrust laws did not apply to railroads at all. In

part because of this phenomenon, over plaintiffs' objections at trial, I submitted to the jury the issue of whether *the defendant* may have been acting in the good-faith belief that it was merely carrying out policies approved or encouraged by the ICC. The jury rejected this "regulatory climate" contention, however, hence that issue need not be considered further.

*In re Lower Lake Erie,* 759 F.Supp. at 225 (emphasis added). It was thus clear that the court believed that although good faith is not ordinarily an antitrust defense, the regulatory landscape in which B & LE operated made it a potential one in MDL 587. The Third Circuit observed:

> The district court also instructed the jury concerning B & LE's good faith and regulatory climate defenses and informed the jury that, if the company's conduct was consistent with the overall policies of the ICC, it was not in violation of the antitrust laws.

*In re Lower Lake Erie,* 998 F.2d at 1160–61. The court specifically held that the instructions on the good-faith and regulatory climate defenses were accurate and properly informed the jury on the scope of *Keogh.* In light of the jury's findings the court rejected B & LE's argument that its conduct of record necessarily had to be limited to the immunity accorded to the railroads' rate-making activities, concluding that *Keogh* did not give the railroads "cart blanche to preclude competition." Thus, the issues of whether B & LE entertained a good-faith belief that its actions were not in furtherance of a conspiracy to restrain trade and maintain a monopoly and/or whether it believed its actions were reasonable and consistent with the overall policies of the ICC may not now be set aside as wrong.

By necessity then, B & LE became a knowing participant in a conspiracy which it understood had the goals of restraining trade and monopolizing inland transportation of ore and it committed knowing and willful acts in furtherance of those goals.

The only logical conclusion which can be drawn is that B & LE understood what it was doing, knew that the exclusion of the low-cost competitors from the market was the object of the agreement, became a participant in that agreement and affirmatively sought to further those illegal goals without a good-faith or reasonable belief that it had justification for doing so. Under these circumstances, an understanding by the actor that the potential low-cost competitors would be deprived of opportunities to compete and would be deprived of the economic benefits that any such competition would create is a virtual certainty. It follows that B & LE intended to cause the same general type of injury which harmed the MDL 587 plaintiffs.

■■■■■ Moreover, shifting the loss from B & LE's knowing and willful participation in a conspiracy to restrain trade and maintain a monopoly over a market of commerce precisely is the type of pernicious mischief which Pennsylvania public policy prohibits being shifted to an insurer. Agreements or practices which facially demonstrate a "pernicious effect on competition and lack any redeeming virtue" whatsoever qualify for special treatment under the Sherman Act and "are conclusively presumed to be ... illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Agreements or practices which raise such concerns and demand heightened scrutiny include price-fixing schemes, group boycotts and division of markets. *Id.* See also *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (discussing horizontal group boycotts which are illegal *per se* ); *Malley–Duff & Assocs. v. Crown Life Ins. Co.,* 734 F.2d 133, 140 (3d Cir.1984) (group boycott with purpose to exclude competitors from the market is illegal *per se* ). B & LE was found guilty

of a criminal conspiracy in violation of Sections 1 and 2 of the Sherman Act and "the same conspiratorial conduct described in the criminal indictment [became] the subject of [the civil antitrust suit]." *In re Lower Lake Erie,* 998 F.2d at 1162 n. 7. B & LE's *nolo contendere* plea to the criminal indictment established that it had knowingly and willfully become a participant in an agreement outside its ICA immunity, the purpose of which "was to ward off the outside competition heralded by the advent of the self-unloaders" and to use the collective power of the railroads to blackball competitors. *United States v. Bessemer & Lake Erie R. Co.,* 717 F.2d at 601–02. The goals of the criminal agreement were to eliminate competition from private docks, to eliminate competition among themselves without seeking or obtaining ICC approval and to eliminate competition from trucks in the transportation of ore. *Id.* at 596–97. B & LE's plea established the illegal conspiracy existed, B & LE knowingly joined it, B & LE joined it with the intent to restrain competition unreasonably and the conspiracy concerned goods or services in interstate commerce. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *see also* 3 Sand, et al., *Modern Federal Jury Instruction* at Instruction Criminal 58–44 (1999).

 "Where an insured is alleged to have willfully or negligently violated the law, knowing it will obtain financial gain therefrom at another's expense, the insured may not, as a matter of public policy, contractually exempt itself from responsibility for its actions." *Enron,* 47 F.Supp.2d at 1166; *accord Central Dauphin School District,* 426 A.2d at 96; *BLaST,* 674 A.2d at 690. The conspiracy was designed to distort the natural forces of the market by precluding the entry of low-cost competitors. This distortion permitted B & LE and the other railroads to maintain an illegal monopoly and continue to enjoy inflated market profits from the steel companies' lost savings and investment opportunities and the private dock and trucking companies' lost abilities to compete. The jury's damage awards necessarily reflected gains and profits from the railroads' services during this period which would have gone to others had the conspiracy not usurped the MDL 587 plaintiffs' opportunities and potential benefits. The MDL 587 judgments against B & LE reflected offsets for the settlements of the other conspirators. Under these circumstances permitting B & LE to shift the loss would have the potential to permit it to retain revenue it gained through the knowing and willful violation of a criminal statute. It also could potentially encourage others to engage in unlawful activity for the purpose of reaping benefits from such activity with the belief that any repercussions may well be minimized through insurance. Pennsylvania's public policy prohibits the shifting of such non-fortuitous losses under such circumstances.

Summary judgment is appropriate where, as here, the entire record demonstrates that no material issues of fact remain for trial and the movant is entitled to judgment as a matter of law. The material facts which control the court's disposition either are uncontested, established by the prior litigation, or presumptively established and challenged with merely colorable evidence and conclusory allegations and arguments. As the above makes clear, the MDL 587 losses do not fall within the scope of the Insuring Agreement and, even assuming that they did, public policy bars the plaintiffs' attempts to shift the loss to defendants under the specific circumstances which gave rise to the MDL 587 liability. Accordingly, defendants' motion for summary judgment will be grant-

ed and plaintiffs' will be denied.[23]

23. Because defendants are entitled to summary judgment for the reasons set forth above, we do not reach their remaining arguments raising, *inter alia,* the defenses of prejudice by late notice as a matter of law and other public policy grounds as a bar to recovery.